[No. F004691. Fifth Dist. Sept. 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT RAYMOND CAVAZOS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The parts certified for publication follow.

## COUNSEL

Kent A. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey, Supervising Deputy Attorney General, and Garrett Beaumont, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.**—Appellant was convicted after a jury trial of possession of phencyclidine (PCP) for sale. (Health & Saf. Code,

§ 11378.5.) He was committed to the California Rehabilitation Center for a five-year term.

Appellant's conviction is based on the following evidence. Around midnight near a busy, well-lighted intersection in Bakersfield, appellant and his cousin Mark Sanchez were seen by Officer Charmley walking unsteadily along the sidewalk in an area frequented by PCP users. The officer particularly noted appellant who was staggering. The officer got out of his marked patrol car to talk to the men, but when they saw the officer they turned away and kept walking. When the officer told them to stop, appellant took an object from his right front pocket and tossed it into the gutter about two feet from where he was standing.

After appellant and Sanchez were detained, a brown bottle containing 5.4 milliliters of PCP was found in the gutter. The officer could smell ether on the bottle and on appellant's hands. Appellant appeared to be under the influence of something.

Appellant was arrested and taken to jail (Sanchez was released). In the booking area, appellant tried to give his Kool cigarettes to another inmate. Expert testimony was introduced to the effect that 5.4 milliliters of PCP was too much for personal use and that Latins tended to smoke PCP on Kool cigarettes.

At trial, appellant called Sanchez as a witness. Sanchez testified that he and appellant tried to avoid the police officer when they first saw him because Sanchez had been physically abused by officers in an incident about two weeks earlier. Sanchez stated that he never saw appellant with PCP nor did he see appellant throw a bottle into the gutter on the evening in question. Over defense objection, Sanchez was impeached with a "two to three year old" prior conviction of assault with a deadly weapon.

Appellant testified that he never possessed the PCP bottle and did not throw it into the gutter. However, he said that he had seen the bottle earlier that evening when Sanchez showed it to him and offered him a cigarette. When appellant declined the offer, Sanchez put the bottle back in his (Sanchez') pocket. Appellant denied that he had PCP on his hands when he was arrested and maintained that it was Sanchez who was walking next to the gutter when they were stopped by the officer.

· · · · · · · · · · · · · · · · · · · · · · · · · · ·*

DISCUSSION

I*

· · · · · · · · · · · · · · · · · · · · · · · · · ·

II

*Sanchez' prior conviction of assault with a deadly weapon involved moral turpitude.*

■ Subject always to the trial court's discretion under Evidence Code section 352, a prior felony conviction that necessarily involves moral turpitude may be used to impeach a witness in a criminal proceeding. (*People v. Castro* (1985) 38 Cal.3d 301, 306 [211 Cal.Rptr. 719, 696 P.2d 111].) "[M]oral turpitude" means a general "'readiness to do evil'" (*id.*, at p. 314), i.e., "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; 2 Bouvier's Law Dict. (3d rev. 1914) p. 2247; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 375, pp. 424-425; see also Annot. (1975) 23 A.L.R.Fed. 480, 488 involving exclusion or deportation of aliens under Federal Immigration and Naturalization Act.)

*Castro* makes no attempt to list or define those felonies which involve moral turpitude but it makes clear that moral turpitude does not depend on dishonesty being an element of the felony. ". . . it is undeniable that a witness' moral depravity of *any kind* has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty." (Italics added; *People v. Castro, supra,* 38 Cal.3d at p. 315.)

■ The *Castro* court also makes reference to its prior opinion in *People v. Rist* (1976) 16 Cal.3d 211, 222 [127 Cal.Rptr. 457, 545 P.2d 833] that "convictions which are *assaultive* in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity" (16 Cal.3d at p. 222, emphasis added) and then concludes "'*Not as heavily*' does *not,* of course, mean '*not*

---

*See footnote *ante,* page 589.

*at all.'"* (Italics added, *People* v. *Castro, supra,* 38 Cal.3d at p. 315.) Thus, we have a clear indication from the Supreme Court that assaultive crimes bear some relevance to the credibility of a witness. "Certainly the inference is not so irrational that it is beyond the power of the People to decree that in a proper case the jury must be permitted to draw it, if it wishes, and the 'no limitation' language of subdivision (f) makes it abundantly clear that the People so decreed." (*Ibid.*)

■ Finally, *Castro* holds that in deciding whether a felony offered for impeachment necessarily involves moral turpitude, the trial court may look only to the "least adjudicated elements" of the crime of which the witness was previously convicted. (38 Cal.3d at p. 317.) It may not go behind the conviction and take evidence on the underlying facts.

■ We turn now to the application of the *Castro* principles to the present case. Witness Sanchez was impeached by his prior conviction of assault with a deadly weapon. California law defines an assault as ". . . *an unlawful attempt,* coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240, italics added.) So defined, an assault departs from the common law definition in two respects. First, under the statute, a conviction for assault requires more than intent to frighten the victim; the defendant must intend to commit a battery; and second, the defendant must have the present ability to commit the battery. (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 99 [192 Cal.Rptr. 748, 665 P.2d 520].) ■ Although the statutory definition of an assault refers to the attempt to commit a "violent injury" on another person, the "least touching" will suffice to constitute a battery. (1 Witkin, Cal. Crimes (1963) § 258, pp. 243-244.) Thus, a simple assault does not necessarily show moral turpitude. Only by looking behind the conviction to the particular facts can moral turpitude be ascertained.

■ Paradoxically, our Supreme Court has held that not only simple assault but assault with a deadly weapon constitutes a general intent crime in the context of a defense of intoxication short of unconsciousness. (See *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Rocha* (1971) 3 Cal.3d 893, 898-899 [92 Cal.Rptr. 172, 479 P.2d 372].) To avoid permitting a person who voluntarily gets drunk and assaults another from escaping the penal consequences of his action, the court ruled that an assault does not require a specific intent to injure. "Accordingly the intent for an assault with a deadly weapon is the intent to attempt to commit a battery, a battery being 'any willful and unlawful use of force or violence upon the person of another.' (Pen. Code, § 242.) We conclude that the criminal intent which is required for assault with a deadly weapon . . ., is the general intent to wilfully commit an act *the direct, natural and probable*

*consequences of which if successfully completed would be the injury to another.* Given that intent it is immaterial whether or not the defendant intended to violate the law or knew that his conduct was unlawful. The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary." (*People* v. *Rocha, supra,* 3 Cal.3d at p. 899, fns. omitted.)

■ Assuming, as we must, that an assault with a deadly weapon does not require proof of a specific intent to harm another, it nevertheless does require proof of an unlawful *attempt* to inflict physical force upon another person. The jury is so instructed. (CALJIC No. 9.00 (4th ed. 1979).) Because an attempt to commit a battery requires a specific intent to commit the battery and a direct but ineffectual act done towards its commission (Pen. Code, § 664; 1 Witkin, Cal. Crimes, *op. cit. supra,* § 93, pp. 90-91) and because a deadly weapon is used to effectuate the attempted battery, it follows that the "least adjudicated elements" of the crime of an assault with a deadly weapon involve some degree of moral turpitude. It is the use of the deadly weapon which elevates the assault to a moral turpitude crime.

The Supreme Court holdings in attorney discipline cases that assault with a deadly weapon does not necessarily involve moral turpitude (*In re Rothrock* (1940) 16 Cal.2d 449, 459 [106 P.2d 907, 131 A.L.R. 226]; see 1 Witkin, Cal. Procedure, *op. cit. supra,* § 375, pp. 424-430) should be distinguished. In those cases, the court was formulating a standard by which to determine the attorney's fitness to continue his practice according to the ethical standards of his profession. Simple fairness requires the court to look behind the conviction to ascertain the precise nature of the assault and the circumstances in which it occurred. The bare fact of conviction does not determine the attorney's fitness to practice.

Our conclusion that an assault with a deadly weapon necessarily involves moral turpitude accords with common sense and generally accepted community standards. The average person walking down the street would believe that anyone who unlawfully attempts to injure another with a deadly weapon is guilty of some degree of moral laxity.

### III

*The trial court's failure to exercise Evidence Code section 352 discretion as to Sanchez' prior conviction was harmless error.*

■ *People* v. *Castro* holds that a trial court's failure to exercise its discretion in determining the admissibility for impeachment purposes of a prior conviction involving moral turpitude is reviewable under the *Watson*

standard. (*People* v. *Castro, supra,* 38 Cal.3d at p. 319; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ██ Thus we must determine if it is reasonably probable that absent the error the verdict would have been different.

██ Since the "error" in this situation is the trial court's failure to exercise its discretion (which means that in all but exceptional cases the trial court rationally could have excluded the prior in the exercise of its discretion), in determining prejudice we should assume that the trial court would · have excluded the prior conviction. Only by this assumption can we preserve the defendant's right to the trial court's exercise of discretion.

██ The prosecution's case was strong. Officer Charmley positively identified appellant as the person who threw the PCP bottle into the gutter. He subsequently smelled ether on the bottle and on appellant's hands. Later, while being booked, appellant tried to give his Kool cigarettes to another inmate. Appellant also acknowledged that he had seen the PCP bottle in Sanchez' possession earlier in the evening.

Appellant's theory at trial—as evidenced by defense counsel's closing argument to the jury—was to portray Sanchez as the criminal, i.e., as the one who possessed the PCP and threw it into the gutter and that the two men had originally attempted to evade Officer Charmley only because of Sanchez' prior "run-ins" with the law. The jury obviously disbelieved the defense theory and accepted Officer Charmley's direct and unequivocal identification of appellant as the person who possessed the PCP.

The People argue that the impeachment of Sanchez by his prior felony conviction could only have strengthened appellant's defense. It showed Sanchez' prior criminal activity thereby giving credence to appellant's theory that Sanchez was the one who possessed the PCP. The jury may well have considered the prior conviction as showing Sanchez' propensity for criminal activity because no limiting instruction such as CALJIC No. 2.23 (4th ed. 1979)[1] was given or requested. ██ Failure to instruct the jury *sua sponte* as to the limited purpose for which evidence of prior convictions is admitted is not reversible error per se. (*People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 244 [100 Cal.Rptr. 104]; Evid. Code, § 355.)

██ However, Sanchez' impeachment did more than strengthen the defense theory—it also must be presumed to have lessened to some degree the

---

[1]CALJIC No. 2.23 (4th ed. 1979) provides: "The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of that witness. . . ."

credibility of Sanchez' testimony that he did not see appellant in possession of PCP, did not see him throw the bottle into the gutter or why he and appellant turned away from Officer Charmley. In other words, if an assault with a deadly weapon conviction has any relevance to credibility, as we must assume that it does, it dampened the jury's belief in Sanchez' truthfulness. Thus, we have two countervailing effects of Sanchez' impeachment: it aided appellant's defense by showing that Sanchez, not appellant, was the guilty person, and at the same time, it lessened the truthfulness of Sanchez' exculpatory testimony that appellant was not the guilty person.

Placing all of the facts in perspective, we conclude the opposing consequences of Sanchez' impeachment wash out insofar as prejudicing appellant in the eyes of the jury. It is not reasonably probable that absent the impeachment the verdict against appellant would have been different.

Appellant argues that this is a close case on the evidence because the jury deliberated for two and a half hours before returning its verdict. Appellant also notes that the jury asked the court about the nature of appellant's work. Neither the length of deliberations nor the jury's question makes the case close for the purpose of evaluating prejudice from Sanchez' impeachment. The case hinged on the jury's determination of the credibility of Officer Charmley vis-à-vis appellant. Sanchez' credibility was suspect from the outset because he was appellant's cousin and close friend and also because Sanchez, according to appellant, had possessed the PCP bottle earlier in the evening and had offered a PCP cigarette to appellant. This testimony placed Sanchez in a bad light totally apart from the fact that he had assaulted someone two to three years before the trial.

■ Generally, an assaultive crime has minimal probative value to the credibility of a witness. (Cf. *People* v. *Castro, supra,* 38 Cal.3d at p. 315.) For this reason it would have been the wiser course if the prosecution had avoided muddying the water by not offering the prior assault for impeachment. We do note that the district attorney wisely refrained from commenting on the impeachment during closing arguments. In all probability, the jury gave it little consideration.

The judgment is affirmed.

Hamlin, J., and Ritchey, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.