[No. F008003. Fifth Dist. Apr. 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ALAN MANSFIELD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part II.

**COUNSEL**

Thomas J. Keene, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi and Janet Bangle, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), J.\***—Appellant, David Alan Mansfield, was found guilty by a jury of one count of lewd and lascivious conduct upon a child under 14 years of age (Pen. Code, § 288, subd. (a))[1] and two counts of misdemeanor child molestation (§ 647a—now 647.6). He was found not guilty on an additional five counts and one count was dismissed after the jury could not agree as to that count. Imposition of sentence was suspended and appellant was placed on probation for three years on condition he serve twelve months in the county jail. He appeals. We will reverse.

### FACTS

On February 8, 1986, April G. went to visit and spend the night with her friend, the victim, Lisa B. Two days earlier, Lisa had turned twelve years old. Appellant was present at the apartment in Atwater occupied by Lisa and her mother at this time, for Lisa's mother, a friend of appellant's, had permitted him to move in with them several months earlier.

Lisa testified that on this evening in February of 1986 she and April played a wrestling game with appellant, after which April and Lisa sat on

---

\* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code unless otherwise indicated.

appellant's lap. Appellant began rubbing Lisa's thigh through her pants leg, and was breathing on her neck. At this time April noticed what was happening and she suggested that she and Lisa go upstairs to Lisa's room, which is what the girls did. According to April, Lisa asked her not to tell because Lisa was afraid she might get into trouble, and then Lisa cried. About an hour later, Lisa and April went back down to the living room to watch a movie. When Lisa moved to the couch, appellant got out of his chair and moved to the couch. After April fell asleep during the movie, appellant rubbed Lisa's chest, kissed her on the mouth, and took off her shirt and kissed her on the breasts. He then took off her pants, kissed her on the vagina, and put his tongue inside her vagina. He took off his clothes and attempted to penetrate her vagina with his penis, but when April stirred appellant got up and left Lisa alone.

On March 12, 1986, appellant moved into the new residence that Lisa and her mother had just moved into. A couple of weeks after this, while Lisa's mother and her live-in fiancé were asleep in a bedroom, Lisa and appellant were in the living room watching television. Lisa testified appellant began kissing her on the lips, took off her shirt, took off her pants, and began kissing her on the vagina. He put his tongue into her vagina, then tried to insert his penis into it. Lisa resisted, got away, and retreated to her bedroom.

Approximately two weeks after this, on a Sunday evening, Lisa and appellant were watching television in the living room. After a time, each retreated to their respective rooms. However, Lisa's television set was not working correctly, so she asked appellant if she could watch the remainder of the program on the set in his bedroom. Appellant agreed, so Lisa went into the room, sat on the floor, and watched the show while he sat on the bed. Because she was having a hard time seeing the set and became uncomfortable, she got onto the bed with him. Lisa testified that at this time appellant again began kissing her on the lips. Appellant then took off Lisa's shirt, began kissing her on her breasts, removed her pants, began kissing her on the vagina, and attempted penetration with his tongue. He also attempted penetration with his penis, but was interrupted by a knock on the door. Lisa's mother had knocked on the door, but went downstairs and into the kitchen when she heard a noise downstairs. Appellant stopped after the knock and let Lisa get dressed. Lisa's mother returned to the bedroom and found Lisa lying on a pile of blankets in front of the television set, while appellant was lying on the bed. She then told Lisa that it was time for Lisa to go to bed, so Lisa retreated to her bedroom.

Throughout all of this, Lisa was afraid to tell her mother because she was afraid appellant would hurt her. She was also afraid of her mother's temper

and that it could cause her mother and her mother's fiance not to get married. Appellant and the fiance were friends.

The investigation that led to the charges in this case came about when April and another of Lisa's friends, Carrie, became worried about Lisa and told the school authorities what had happened.

### THE DEFENSE'S CASE

Appellant took the stand in his own defense and testified no improper contact between him and Lisa had ever taken place.

Appellant called as witnesses his mother and brother, who each stated Lisa did not have a very good reputation for telling the truth. Appellant also called as a witness a former live-in lover of Lisa's mother who testified Lisa had, on one occasion, made up a story about him being her "boy-friend," and sitting on the couch together, "touching and kissing."

Appellant called as a fourth witness a man who testified he observed appellant and Lisa together during February through March 1986 and, in his opinion, Lisa did not fear appellant at this time. Lastly, appellant called the police officer who had investigated this case, Detective Richard Hawthorne. Detective Hawthorne testified that when he had originally interviewed Lisa she referred to appellant touching her breasts, rather than rubbing her thigh, in summarizing the first incident in February.

### DISCUSSION

### I

The crucial issues in this case arise out of the denial by the trial court of appellant's prejury impanelment motion to disallow the use of a prior felony conviction of felony battery (§ 243, subd. (d))[2] for impeachment.[3] Appellant testified in the instant case, and the prior felony was used to impeach him. CALJIC No. 2.23,[4] which instructs the jury in substance that prior felony

---

[2] Section 243, subdivision (d) provides: "When a battery is committed against any person and serious bodily injury is inflicted on the person, the battery is punishable by imprisonment in the county jail for a period of not more than one year or imprisonment in the state prison for two, three, or four years."

[3] The circumstances of the prior conviction were that appellant and his friends had gotten involved in a brawl at a pizza restaurant, and he struck a person in the face with a motorcycle helmet, inflicting serious facial injuries.

[4] CALJIC No. 2.23 provides: "The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the

convictions can be used only for the purpose of determining credibility, was not given. It is conceded by respondent to be a sua sponte instruction.

■ We will conclude that a prior conviction of violating section 243, subdivision (d) (felony battery) does not qualify under *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] as a felony involving moral turpitude and therefore should not have been used to impeach appellant and we will further decide that the error, under the circumstances of this case, was prejudicial.

Pursuant to *People* v. *Castro, supra,* 38 Cal.3d 301, and subject to the trial court's discretion under Evidence Code section 352, only prior felony convictions that necessarily involve moral turpitude may be used to impeach a witness in a criminal proceeding. (*Id.* at p. 306.) ■ "Moral turpitude" means a general " 'readiness to do evil' " (*id.* at p. 314), i.e., "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; 2 Bouvier's Law Dict. (3d rev. 1914) p. 2247; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 375, pp. 424-426; see also Annot. (1975) 23 A.L.R. Fed. 480, 488 involving exclusion or deportation of aliens under Federal Immigration and Naturalization Act.) *Castro* makes no attempt to list or define those felonies which involve moral turpitude, but it makes clear that moral turpitude does not depend on dishonesty being an element of the felony. "[I]t is undeniable that a witness' moral depravity of *any kind* has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty." (*People* v. *Castro, supra,* 38 Cal.3d at p. 315; italics added.)

■ Finally, *Castro* holds that in deciding whether a felony offered for impeachment necessarily involves moral turpitude, the trial court may look only to the "least adjudicated elements" of the crime for which the witness was previously convicted. (*Id.* at p. 317.) This concept simply means that in determining whether a previous felony involves moral turpitude the court cannot go behind the conviction and take evidence on or consider the facts and circumstances of the particular offense. Instead, the court must look to the statutory definition of the particular crime and only if the least adjudicated elements of the crime necessarily involve moral turpitude is the prior conviction admissible for impeachment purposes. (*People* v. *Statler* (1985) 174 Cal.App.3d 46, 53 [219 Cal.Rptr. 713].)

■ "A *battery* is any willful and unlawful use of force or violence upon the person of another." (§ 242, italics added.) The word "violence" has no

witness' credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

real significance. "It has long been established, both in tort and criminal law, that 'the least touching' may constitute battery. In other words, *force* against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark." (1 Witkin, Cal. Crimes (1963) Crimes Against the Person, § 258, pp. 243-244; see *People* v. *Bradbury* (1907) 151 Cal. 675, 676 [91 P. 497]; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589, 594 [218 Cal.Rptr. 269]; *People* v. *Whalen* (1954) 124 Cal.App.2d 713, 720 [269 P.2d 181].) A person need not have an intent to injure to commit a battery. He only needs to intend to commit the act. (1 Witkin, *supra,* § 258, subd. (3), p. 244.) Thus, a simple battery does not necessarily show readiness to do evil or necessarily involve moral turpitude. (See *People* v. *Cavazos, supra,* 172 Cal.App.3d at p. 594.)

■ The offense of felony battery is a simple battery which results in serious bodily injury. As the court explained in *People* v. *Hopkins* (1978) 78 Cal.App.3d 316 [142 Cal.Rptr. 572], " 'technically' force likely to cause serious bodily injury is not a requirement of section 243." (*Id.* at p. 320.) Also, "[t]he statute (§ 243) makes a felony of the act of battery which results in serious bodily harm to the victim no matter what means or force was used." (*Ibid.*) Further, "section 243 focuses on the actual injury inflicted, not on the force used." (*Ibid;* see also *People* v. *Parrish* (1985) 170 Cal.App.3d 336, 343 [217 Cal.Rptr. 700].)

Thus, the state of mind necessary for the commission of a battery with serious bodily injury is the same as that for simple battery; it is only the result which is different. It follows that because simple battery is not a crime involving moral turpitude, battery resulting in serious bodily injury necessarily cannot be a crime of moral turpitude because it also can arise from the "least touching." Although serious injury resulting from a simple offensive touching may not be likely,[5] in determining whether a certain crime is one of moral turpitude, the reviewing court may not go behind the conviction and take evidence on the underlying facts. (*People* v. *Castro, supra,* 38 Cal.3d at p. 317.)

■ This analysis dictates the least adjudicated elements of battery resulting in serious bodily injury do not necessarily involve force *likely* to cause serious injury. Again, since it is the least adjudicated elements of a

---

[5]Such a scenario may not be likely, but at least one court in another context has recognized it could happen: " '. . . section 243 addresses the result of conduct rather than proscribing specific conduct. Thus, one may conceivably commit a felony battery without committing an aggravated assault. For example, a push that results in a fall and concomitant serious injury may not be sufficient deadly force to permit successful prosecution under section 245, subdivision (a). *However, it is triable as felony battery.* ' [Citation.]" (*In re Ronnie N.* (1985) 174 Cal.App.3d 731, 735 [220 Cal.Rptr. 365], italics added.)

crime which are looked to in determining whether the crime is one of moral turpitude, and the crime at issue on this appeal can occur from the least offensive "push," it is not a crime of moral turpitude. This conclusion that battery resulting in serious bodily injury does not involve moral turpitude accords with common sense and generally accepted community standards. The average person walking down the street would not believe that someone who pushes another is a culprit guilty of moral laxity or "general readiness to do evil," even if the push was willful and results in serious injury.

We conclude a battery resulting in serious bodily injury in violation of section 243, subdivision (d) is not a crime necessarily involving moral turpitude and the trial court erred in admitting its use for impeachment.

Respondent cites *People* v. *Williams* (1985) 169 Cal.App.3d 951 [215 Cal.Rptr. 612] as authority for the proposition that battery resulting in serious bodily injury is a crime of moral turpitude. In *Williams,* the trial court entered a judgment of conviction against defendant upon jury verdicts of guilty of receiving stolen property and possession of a concealable firearm. The trial court had denied defendant's motion to suppress evidence of three prior felony convictions for automobile theft, battery by a jail inmate upon a noninmate, and burglary, on the ground Proposition 8 deprived it of discretion to suppress such evidence. On appeal, the defendant asserted that decision was error. The Court of Appeal affirmed. The court held that the trial court erred in failing to exercise discretion to admit or exclude any crimes involved, but such error was not reversible in light of the strong evidence of the defendant's guilt. With respect to the prior conviction for battery, the court stated: "It will be remembered that the prior convictions of the case before us were burglary, automobile theft, and battery by a jail inmate upon a noninmate. As to the burglary and automobile theft convictions, moral turpitude was clearly involved. And, we opine, that battery by a jail inmate upon a noninmate, a crime of violence, demonstrates 'a general readiness to do evil,' and thus moral turpitude. All reasonably lay within the broad discretion reposed in the trial court by *Castro* and Evidence Code section 352." (*People* v. *Williams, supra,* 169 Cal.App.3d at p. 957.)

At no point did the court discuss the least adjudicated elements of battery by a jail inmate upon a noninmate, as required by *Castro.* The conclusion of the *Williams* court that this is a crime of moral turpitude appears to be a conclusion which relied on the underlying facts of the conviction, contrary to the precepts of *Castro.* We disagree with the court's conclusion in this regard.

## II*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is reversed and the cause remanded for a new trial.

Hamlin, Acting P. J., and Ballantyne, J., concurred.

A petition for a rehearing was denied May 4, 1988, and respondent's petition for review by the Supreme Court was denied July 21, 1988.

---

* See footnote, *ante*, page 82.