[No. F009738. Fifth Dist. Nov. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCIS ELWELL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

Steven L. Whiteside, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and Wanda Hill Rouzan, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**BEST, J.**—Defendant was convicted of second degree robbery in violation of Penal Code[1] section 211. Her sole contention on appeal is that the trial court erred in admitting for impeachment purposes her prior felony conviction of assault by means of force likely to produce great bodily injury, a violation of section 245, subdivision (a)(1). We affirm the judgment.

### STATEMENT OF FACTS

At approximately 8 p.m. on September 15, 1987, Debra Brown drove to Vibes Market to cash a check and buy some diapers. After purchasing some items and cashing her check, Brown placed approximately $265 in cash in her purse and left the store. Brown was followed by defendant, who asked Brown for some matches as Brown approached the trunk of her car. Brown said she did not have any, but told defendant that the store gives them away. Defendant then turned and walked in the direction of the store and Brown began putting her grocery items into the car on the driver's side. While loading the groceries, Brown threw her purse into the car on the passenger's side of the seat.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

At some point, Brown noticed defendant standing at the corner of the trunk of her car. Defendant was leaning over and appeared to be pulling her socks up. As Brown pulled the shopping cart away from the car and allowed the driver's door to close, she observed defendant lean into her car and come out with Brown's purse in her hand.

Defendant immediately took off running. Brown yelled at her to give back her purse and ran after defendant. After about 10 feet Brown caught up with defendant, grabbed hold of her purse and tried to get it back. Brown also began yelling for the police and for help. Defendant pushed Brown to the ground and began hitting and kicking her. She hit Brown in the face and kicked the back of her leg and her side. Brown was struck and kicked several times.

By the time the struggle for the purse was over, there were about 20 people in the parking lot and Brown had recovered her purse. Defendant then was claiming to the crowd that it was her purse and that Brown had stolen it. Defendant left the parking lot and crossed the street stating she had to get her "ID." Several of the people who were in the parking lot followed defendant.

Olivia Aranda, whose house is located next to the Vibes Market parking lot, testified that she was at home on September 15, 1987, and went outside when she heard someone calling for help. Aranda observed one woman on the ground and another woman on top of her fighting over a purse. Aranda identified the woman on the ground as Miss Brown and defendant as the woman on top of Brown. Defendant was trying to take the purse away from Brown by pulling on the strap. The struggle ended when both women stood up. Defendant left the parking lot and crossed the street.

During the struggle, Aranda testified that defendant was pulling on the strap of the purse with one hand and pulling the hair of Brown and hitting her with the other hand. Brown was yelling that it was her purse and that she was not going to let it go. Brown was not hitting defendant. When the two women stood up, defendant said she wanted to see her mother. Defendant then hit Brown, knocked her to the ground again, and tried to walk away.

While on patrol at approximately 8 p.m. on September 15, 1987, Deputy Sheriff Mark Rademacher responded to a call in the area of Vibes Market. When he arrived, a group of individuals had defendant detained. Someone told him defendant had stolen somebody's purse from Vibes Market. He later spoke to Brown at Vibes Market and asked to look into the purse in

Brown's possession. Inside the purse Officer Rademacher found a driver's license issued to Brown.

After advising her of her *Miranda* rights, Rademacher spoke with defendant at the jail. Defendant told him that she went to Vibes Market to buy some foil paper. She then went outside and asked Brown for a match. Brown then pushed a shopping cart at her and she pushed it back at Brown. Brown then jumped at her and started saying that defendant tried to steal her purse. When she was asked what happened to the foil paper, defendant stated it was on the ground in the parking lot. Officer Rademacher testified that he did not see a box of foil paper in the parking lot.

Francis Ornelas, a cashier at Vibes Market, testified that on September 15, 1987, at approximately 8 p.m., she was checking out a lady's groceries and discussed her welfare check with her. Defendant, holding some foil paper, was standing two people behind the first lady. Defendant placed the foil paper on the counter stating she wanted to see if "this is what the foil they want." Defendant then stated she would be right back and ran out of the front door. Defendant never returned to the store.

## DEFENSE CASE

Testifying on her own behalf, defendant admitted being at the store but claimed she told a different cashier, not Ornelas, that she would be right back. Defendant also admitted taking Brown's purse from her car but claimed she did not strike or kick Brown at all. Instead, defendant testified that when Brown caught up to her, she grabbed defendant's hair. Defendant immediately told Brown that she would give her back her purse, "just let me go." At this time, Brown was holding onto defendant and the purse. One of the straps of the purse was caught on defendant's arm and the other was caught on Brown's arm. Defendant denied that she attempted to take the purse from Brown during the struggle. Instead, defendant repeated four or five times that she would give back the purse.

After her arrest, defendant recalled that the deputy sheriff questioned her at some point, but she could not recall her statements to him.

## DISCUSSION

### I

*Is an Assault by Means of Force Likely to Produce Great Bodily Injury a Crime of Moral Turpitude for Purposes of Impeachment Under People v. Castro (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]?*

■ Defendant made a pretrial motion to exclude evidence of her prior conviction for assault by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(1). After determining that the prior conviction was admissible pursuant to *People v. Castro, supra,* 38 Cal.3d 301, the court exercised its discretion pursuant to Evidence Code section 352 and denied the motion.

In *People v. Castro,* the Supreme Court held that only evidence of crimes of moral turpitude can be used to impeach a witness. (*People v. Castro, supra,* 38 Cal.3d at p. 314.) The court defined moral turpitude in terms of a "readiness to do evil." (*Ibid.*) The court also noted that although convictions for assaultive crimes may not weigh as heavily as those based on dishonesty or some other lack of integrity, " 'Not as heavily' does not, of course, mean 'not at all.' " (*Id.* at p. 315.)

Although it is well settled that assault with a deadly weapon is a crime of moral turpitude (*People v. Valdez* (1986) 177 Cal.App.3d 680, 696 [223 Cal.Rptr. 149]; *People v. Means* (1986) 177 Cal.App.3d 138, 139 [222 Cal.Rptr. 735]; *People v. Armendariz* (1985) 174 Cal.App.3d 674, 682 [220 Cal.Rptr. 229]; *People v. Jackson* (1985) 174 Cal.App.3d 260, 266 [220 Cal.Rptr. 39]; *People v. Cavazos* (1985) 172 Cal.App.3d 589, 595 [218 Cal.Rptr. 269]), defendant contends that an assault by means of force likely to produce great bodily injury (aggravated assault) is not a crime of moral turpitude and, therefore, the trial court erred in admitting evidence of such a prior conviction for impeachment purposes. Specifically, citing *People v. Cavazos, supra,* defendant contends that it is the use of the weapon which causes the crime to be one of moral turpitude. She argues that an aggravated assault without a weapon, however, is not necessarily a crime of moral turpitude.

It is true that this court stated in *People v. Cavazos, supra,* 172 Cal.App.3d 589, 595, that "It is the use of the deadly weapon which elevates the assault [with a deadly weapon] to a moral turpitude crime." However, this statement was made as a way of distinguishing assault with a

deadly weapon, a crime of moral turpitude, from battery or simple assault, crimes which are not of moral turpitude.

Plaintiff contends that the use of a deadly weapon to commit an assault merely satisfies the requirement of section 245, subdivision (a)(1), that the assault be by means of force likely to cause great bodily injury. (Citing *People* v. *Moore* (1986) 178 Cal.App.3d 898, 904 [224 Cal.Rptr. 204] ["An assault with a firearm necessarily satisfies the additional requirement of paragraph (1) that it constitute an assault by means of force likely to cause great bodily injury"].) Plaintiff concludes that it is not merely the use of the deadly weapon which raises the crime to one of moral turpitude; rather, it is the use of force likely to cause great bodily injury.

In *People* v. *Mansfield* (1988) 200 Cal.App.3d 82 [245 Cal.Rptr. 800], this court reasoned that felony battery is not a crime involving moral turpitude, as follows: " 'A *battery* is any willful and unlawful use of force or violence upon the person of another.' (§ 242, italics added.) The word 'violence' has no real significance. 'It has long been established, both in tort and criminal law, that "the least touching" may constitute battery. In other words, *force* against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark.' (1 Witkin, Cal. Crimes (1963) Crimes Against the Person, § 258, pp. 243-244; see *People* v. *Bradbury* (1907) 151 Cal. 675, 676 [91 P. 497]; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589, 594 [218 Cal.Rptr. 269]; *People* v. *Whalen* (1954) 124 Cal.App.2d 713, 720 [269 P.2d 181].) A person need not have an intent to injure to commit a battery. He only needs to intend to commit the act. (1 Witkin, *supra,* § 258, subd. (3), p. 244.) Thus, a simple battery does not necessarily show readiness to do evil or necessarily involve moral turpitude. (See *People* v. *Cavazos, supra,* 172 Cal.App.3d at p. 594.)

"The offense of felony battery is a simple battery which results in serious bodily injury. As the court explained in *People* v. *Hopkins* (1978) 78 Cal.App.3d 316 [142 Cal.Rptr. 572], ' "technically" force likely to cause serious bodily injury is not a requirement of section 243.' (*Id.* at p. 320.) Also, '[t]he statute (§ 243) makes a felony of the act of battery which results in serious bodily harm to the victim no matter what means or force was used.' (*Ibid.*) Further, 'section 243 focuses on the actual injury inflicted, not on the force used.' (*Ibid*; see also *People* v. *Parrish* (1985) 170 Cal.App.3d 336, 343 [217 Cal.Rptr. 700].)

"Thus, the state of mind necessary for the commission of a battery with serious bodily injury is the same as that for simple battery; it is only the result which is different. It follows that because simple battery is not a crime involving moral turpitude, battery resulting in serious bodily injury

necessarily cannot be a crime of moral turpitude because it also can arise from the 'least touching.'" (200 Cal.App.3d at pp. 87-88.)

While the *Mansfield* case is distinguishable from the instant case, the reasoning employed therein is instructive in resolving this case. Unlike felony battery, an aggravated assault within section 245, subdivision (a)(1), focuses on the force used and not the actual injury inflicted; force likely to cause serious bodily injury is a required element of this crime.

In *People* v. *Armendariz, supra,* 174 Cal.App.3d 674, 681, this court held that "while an assault with a deadly weapon does not require proof of a specific intent to injure another, it does require proof of 'the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another.'" We concluded that "the least adjudicated elements of any assault-with-a-deadly-weapon conviction are (1) the intentional commission of an act (2) with a deadly weapon, (3) the successful completion of which would probably result in injury to the person of another. It is, then, an assaultive crime which, in our view, involves moral turpitude within the meaning of *Castro*." (*Id.* at pp. 681-682.)

An analysis of the aggravated assault portion of section 245, subdivision (a)(1), leads to the same result. The least adjudicated elements of an assault by means of force likely to produce great bodily injury are (1) the intentional commission of an act (2) by means of force likely to produce great bodily injury, (3) the successful completion of which would probably result in a great or serious injury to the person of another.

Furthermore, such a finding is in accordance with common sense and generally accepted community standards. As in *People* v. *Cavazos,* the average person would believe that anyone who unlawfully attempts to injure another by means of force likely to produce great bodily injury is guilty of some degree of moral laxity. (*People* v. *Cavazos, supra,* 172 Cal.App.3d at p. 595.) Thus, the trial court properly found the assault by means of force likely to produce great bodily injury to be a crime of moral turpitude.

## II, III*

. . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 171.

## DISPOSITION

The judgment is affirmed.

Woolpert, Acting P. J., and Stone (W. A.), J., concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 1989.