[No. H023879. Sixth Dist. Mar. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO ALBERT RIVERA, Defendant and Appellant.

COUNSEL

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ELIA, J.—Appellant was convicted by a jury of assault with a deadly weapon inflicting great bodily injury. (Pen. Code, §§ 245, subd. (a)(1), 12022.7, subd. (a), 1203, subd. (e)(3).) The trial court sentenced him to five years in state prison. On appeal, he contends his prior juvenile adjudication for misdemeanor possession of a deadly weapon with intent to commit an assault is not a crime of moral turpitude and thus it was error for the trial court to permit the prosecutor to use it to impeach him at trial.[1] He further contends the trial court erred in giving CALJIC No. 17.41.1. We affirm.

---

[1] This conviction was from a retrial following appellant's acquittal on one count of mayhem and a mistrial when the jury could not reach a verdict as to one count of assault with a deadly weapon. It appears that the juvenile adjudication was not used for impeachment in the first trial.

*Evidence at Trial*

On June 1, 2000, Greg Ruffin was working as a security guard at T's Bar and Grill in San Jose. This establishment is a "bikini bar" where dancers remove their clothing down to bikinis while patrons consume alcohol. Around 1:30 p.m. appellant entered T's with two other men, sat at a table and ordered drinks. One of the men with appellant left the table and went to the VIP room. At 3:00 p.m., one of the dancers told Ruffin appellant and his remaining friend "were being disrespectful." Ruffin explained the rules of the establishment to appellant and his friend and they were "very cooperative." Later, Ruffin was called to the patio area of the club by a dancer named Tiffany. Tiffany told Ruffin there was a "problem on the patio."

When Ruffin came to the patio he saw appellant and both of his friends. Ruffin "realized it was somebody that had already been issued a warning." Ruffin told them "they're not going to be able to stay." Because Ruffin knew the man who had earlier been in the VIP room, he "gave them the courtesy of letting them finish their beers." Ruffin left the patio and went inside the club.

Ruffin testified that, shortly thereafter, "Tiffany, the dancer who retrieved me the first time, came back inside and told me it's escalated, got a little worse, and that they would have to leave." Ruffin returned to the patio, opened the back gate, took the men's beer glasses and put them aside. He explained that they would have to leave. He said, "The party is finished. It's time to go, fellows. I'm sorry." The men said nothing but got up. Appellant, rather than heading for the gate, was "going the wrong way." Ruffin testified that as appellant approached him and was facing him, "I saw a shadow coming up towards my head and I stepped back, and I was hit on the back of my head and my ear. . . . The first blow caught me in the back of my head here and cut my ear in half." He saw appellant hit him in the head and the left arm. He did not see appellant hit him in the shoulder. He did not see a weapon. At no time was he hit from behind, and no one jumped on his back.

Ruffin, larger and stronger than appellant, overpowered him and pushed him against the fence. They were chest to chest against the fence. Ruffin then "went for the legs, picked him up, and brought him to the ground." Ruffin dragged appellant outside and another patron helped him subdue and handcuff appellant. Someone told Ruffin that he was bleeding so he checked his injuries. His left ear was cut in half and he had wounds to his shoulder, bicep and chest. His injuries corresponded to the places where appellant had hit him. He received numerous stitches and spent the night in the hospital. Police called to the scene found no weapons except for some nails near a fence.

Ginger Gamper, a dancer at the club, testified for the defense that she was on the patio talking with appellant's friends at the time of the incident. She said appellant's friend Anthony was the aggressor and that he jumped on Ruffin's back when Ruffin opened the gate. She said Ruffin then turned and grabbed appellant by mistake. Gamper had stated previously that she did not see any blood, that she was uncertain who actually attacked Ruffin, and that a police report that identified appellant as the perpetrator was accurate.

Appellant testified he agreed with Ruffin's version of the events leading up to the altercation, but that he never struck Ruffin. He testified his friend Anthony was the one who was annoying the dancers. When Ruffin came out on the patio and told the men they had to go, Anthony jumped up and challenged Ruffin to make him leave. When appellant stood up to calm Anthony and persuade him to leave, Ruffin grabbed him. Appellant testified, "He grabbed me and I hit the fence, I saw the sky, and I just remember hitting the ground. And then I was in the air again and hit the ground again, and that time I just blacked out." Appellant never saw Anthony jump on, punch or stab Ruffin.

*Impeachment*

■ Appellant contends the trial court erred in permitting him to be impeached with his prior juvenile adjudication for possession of a deadly weapon with intent to assault another person because it is not a crime of moral turpitude.

During trial, outside the presence of the jury, the prosecutor said he intended to impeach appellant with a juvenile adjudication for possession of a deadly weapon with the intent to assault another person. Defense counsel objected on Evidence Code section 352 grounds, relevance grounds, and because the prior offense was not similar to the conduct for which appellant was on trial. The trial court said, "I have reviewed what [the prosecutor] presented and a petition was sustained on the defendant possessing a weapon with intent to use it, and that would be a crime involving moral turpitude and I would allow that." Defense counsel described the conduct involved in the adjudication as occurring when appellant was 15 years old and "he wasn't displaying or threatening anyone with the weapon. Apparently the officer found it in his pocket after he was searched and stopped at Eastridge Mall." Counsel expressed concern that, because appellant was being prosecuted for an offense in which a weapon was used, the facts of the juvenile adjudication would be prejudicial. The trial court said, "the prosecutor would be kept to asking whether or not on credibility whether or not he engaged in conduct amounting to a misdemeanor. If he says no, then this can be brought out."

The court agreed with the prosecutor that his question to appellant could be whether appellant had committed "conduct amounting to a misdemeanor involving moral turpitude." To this defense counsel said, "So if that's the form of the question and nothing else is brought up, I have absolutely no problem."

During cross-examination, appellant was impeached as follows:

"Q.   [THE PROSECUTOR] Mr. Rivera, what is your date of birth?

"A.   2-10-78.

"Q.   Okay. So on December 3rd, 1994, when you were 16 years old, almost 17, you engaged in conduct amounting to a misdemeanor that involved moral turpitude, is that correct?

"A.   Yes.

"[THE PROSECUTOR] Your Honor, if the Court could define moral turpitude for the jury at this time.

"[THE COURT]: Ladies and gentlemen, you'll be given this instruction in connection with all of the instructions in this case. [¶] A crime of moral turpitude is one which involves either dishonesty or a general readiness to do evil."

Appellant contends it was improper to permit impeachment on the basis of the commission of the offense of possession of a deadly weapon with the intent to assault another. Respondent argues appellant waived this issue by consenting to the sanitized version of his prior offense. Because appellant contends that any waiver would constitute ineffective assistance of counsel, we will consider appellant's contention.

■ In *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], the California Supreme Court held that despite Proposition 8's Victims' Bill of Rights amendment to the California Constitution (Cal. Const., art. I, § 28, subd. (f)), the due process clause of the Fourteenth Amendment demanded that a witness could be impeached with a felony conviction only if the conviction involved moral turpitude. (*Castro*, at pp. 313-314.) *Castro* "divided crimes of moral turpitude into two groups. [Citation.] The first group includes crimes in which dishonesty is an element (i.e., fraud, perjury, etc.). The second group includes crimes that indicate a ' "general readiness to do evil," ' from which a readiness to lie can be

inferred. [Citation.]" (*People v. Chavez* (2000) 84 Cal.App.4th 25, 28 [100 Cal.Rptr.2d 680].) As *Castro* explained, it is "easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil.' Nevertheless, it is undeniable that a witness' moral depravity of any kind has some 'tendency in reason' [citation] to shake one's confidence in his honesty. . . . [¶] There is then some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to be dishonest than a witness about whom no such thing is known." (*People v. Castro, supra,* 38 Cal.3d at p. 315, fn. omitted.)

*Castro* declined to list those offenses that did and did not involve moral turpitude. (*People v. Castro, supra,* 38 Cal.3d at p. 314.) Instead, it held that "a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*Id.* at p. 317.) In other words, *Castro* prohibited the court from going "behind the conviction and tak[ing] evidence on or consider[ing] the facts and circumstances of the particular offense. Instead, the court must look to the statutory definition of the particular crime and only if the least adjudicated elements of the crime necessarily involve moral turpitude is the prior conviction admissible for impeachment purposes. [Citation.]" (*People v. Mansfield* (1988) 200 Cal.App.3d 82, 87 [245 Cal.Rptr. 800].)

In *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], the Supreme Court considered whether a witness in a criminal proceeding might be impeached with misdemeanor conduct. The court held that evidence of past misdemeanor conduct bearing on a witness's veracity was admissible in a criminal proceeding subject to the trial court's discretion. (*People v. Wheeler, supra,* at p. 295.) The court concluded that "[m]isconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction. . . . [¶] Of course, the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude." (*Id.* at pp. 295-296, fn. omitted.) Immoral conduct is admissible for impeachment even though the witness was not convicted, or even if the conduct did not constitute a criminal offense. (*Id.* at p. 297, fn. 7.) Admission of such prior misconduct evidence remains subject to the trial court's discretion under Evidence Code section 352, which "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Wheeler,* at p. 296.) "In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony." (*Ibid.*)

Appellant's juvenile adjudication was for possessing a deadly weapon with the intent to assault another in violation of Penal Code section 467, renumbered in 1994 as Penal Code section 12024.[2] Appellant argues, "No published decision has ever held that the mens rea for the offense includes the requirement that the perpetrator intended to use the weapon in the commission of an assault. Therefore, the least adjudicated elements of the offense include the possession of a deadly weapon and an intent to commit an assault."[3]

A simple assault is not a crime of moral turpitude. (*People v. Cavazos* (1985) 172 Cal.App.3d 589, 594 [218 Cal.Rptr. 269].) Simple possession of heroin does not constitute a crime of moral turpitude. (*People v. Castro, supra*, 38 Cal.3d at p. 317.) Appellant asserts, "No meaningful distinction exists between possessing heroin and possessing a dangerous weapon." Thus, appellant argues, possession of a deadly weapon with the intent to assault another is not a crime of moral turpitude because it is the aggregate of elements that are not individually crimes of moral turpitude.

"[W]hile simple possession of heroin does not necessarily involve moral turpitude [citations], possession for sale does—though the trait involved is not dishonesty but, rather, the intent to corrupt others." (*People v. Castro, supra*, 38 Cal.3d at p. 317.) Thus, although simple possession of heroin may not demonstrate moral laxity, in that the possessor most likely exposes only himself to harm with his drug use, possession for sale exposes others to this harm. Likewise, although simple assault is not a crime of moral turpitude, assault with a deadly weapon is. As the court explained in *Cavazos*, "The average person walking down the street would believe that anyone who unlawfully attempts to injure another with a deadly weapon is guilty of some degree of moral laxity." (*People v. Cavazos, supra*, 172 Cal.App.3d at p. 595.)

Appellant parses the definition of possession of a deadly weapon with the intent to assault another and essentially argues that no mix of elements that are not crimes of moral turpitude can produce an offense that is a crime of

[2]Penal Code section 12024 states: "Every person having upon him or her any deadly weapon, with the intent to assault another, is guilty of a misdemeanor."

[3]Respondent notes that although felony impeachment under *Castro* looks to the least adjudicated elements, one might question whether that analysis is necessarily correct in cases of misdemeanor impeachment. *Castro* involved felony convictions, not underlying facts. *Wheeler* impeachment, on the other hand, does not involve convictions, but instead involves conduct. Referring to Justice Arabian's dissent in *Wheeler* (*People v. Wheeler, supra*, 4 Cal.4th at pp. 307-308 (dis. opn. of Arabian, J.)), appellant argues such an analysis would "inevitably result in mini-trials concerning collateral issues, some of which happened long ago with witnesses whose memories of events may have faded, which, in turn, will likely confuse jurors and obfuscate the issues."

moral turpitude. We disagree. We believe the combination of the elements in the offense of possession of a deadly weapon with the intent to commit an assault generates a synergy that represents a degree of public harm significantly greater than simple assault or simple drug possession. We consider the act of carrying a deadly weapon while intending to assault another to be a clear example of conduct indicating "'general readiness to do evil.'" (*People v. Castro, supra,* 38 Cal.3d at p. 315.) The trial court did not err in permitting appellant to be impeached with the sanitized version of this offense.

### CALJIC No. 17.41.1

■ The court instructed with CALJIC No. 17.41.1. Appellant argues that CALJIC No. 17.41.1 intrudes on "the sanctity of juror deliberations that are untainted by the interference of the trial court." The California Supreme Court in *People v. Engelman* (2002) 28 Cal.4th 436 [121 Cal.Rptr.2d 862, 49 P.3d 209] disapproved the future use of CALJIC No. 17.41.1 but held that the giving of this instruction did not infringe upon that defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous jury verdict. (*Engelman,* at pp. 442-445.) The court was not persuaded that CALJIC No. 17.41.1 unconstitutionally impaired the secrecy of jury deliberations. (*Engelman,* at pp. 442-444.)

The appellate record before us does not indicate any allegation of jury misconduct or other problem with the jury deliberations related to the challenged instruction. The instructions in this case, like those in *Engelman,* conveyed the necessity for each juror to exercise his or her impartial, independent judgment. (Cf. *People v. Engelman, supra,* 28 Cal.4th at pp. 444-445.)

### Disposition

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 2003. George, C. J., and Brown, J., did not participate therein.