Filed 9/24/21  P. v. Parker CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CEDRICK DEVONTAE PARKER et al.,<br><br>    Defendants and Appellants. | B305256<br><br>(Los Angeles County Super. Ct. No. TA139632) |

APPEAL from judgments of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

Lonnie L. McDowell for Defendant and Appellant Cedrick Devontae Parker.

Spolin Law and Aaron Spolin for Defendant and Appellant Deandray Bonner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Cedrick Devontae Parker and Deandray Bonner appeal from the judgment following their convictions for multiple murders and other offenses, most gang-related. We reject all of defendants' challenges and affirm. Specifically, we hold (1) the evidence, including an eyewitness identification, was sufficient to support Bonner's convictions arising from a vehicle-to-vehicle shooting in which a man was killed; (2) the record indicates a defense witness would have invoked her right against self-incrimination and refused to testify regardless of the trial court's ruling on impeaching her with a pending criminal charge, and therefore the impeachment ruling did not prejudice Bonner; (3) defendants' disciplinary records in custody and their threatening a codefendant justified placing defendants in concealed restraints during trial; (4) the gang evidence was neither cumulative nor excessive; (5) the trial court did not err by admitting the preliminary hearing testimony of an unavailable witness; and (6) Parker fails to show his counsel was ineffective.

## PROCEDURAL BACKGROUND

An information charged both Bonner and Parker with conspiracy to commit murder (Pen. Code,[1] § 182, subd. (a)(1)) (count 1), carjacking (§ 215, subd. (a)) (count 2), second degree robbery (§ 211) (count 3), two counts of attempted murder (§§ 664/187, subd. (a)) (counts 4 and 5), driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)) (count 9);

---

[1] Unspecified statutory citations are to the Penal Code.

murder (§ 187, subd. (a) (count 10); and assault with a firearm (§ 245, subd. (a)(2)) (count 17).[2]

The information charged Bonner individually with robbery (§ 211) (count 13), assault with a firearm (§ 245, subd. (a)(2)) (count 14), burglary (§ 459) (count 15), murder (§ 187, subd. (a)) (count 23), attempted murder (§§ 664/187, subd. (a)) (count 24), shooting at an occupied vehicle (§ 246) (count 25), and four counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (counts 11, 16, 18, 26).

The information charged Parker individually with murder (§ 187, subd. (a)) (count 20), shooting at an occupied vehicle (§ 246) (count 21), and five counts of possession of a firearm by a gang member (§ 25850, subd. (a)) (counts 7, 8, 12, 19, 22).

The information alleged criminal street gang enhancements on all counts except the firearm possession counts, and various firearm enhancements on all counts except the firearm possession counts and the count for driving or taking a vehicle without consent. The information further alleged special circumstances under section 190.2, subdivisions (a)(3) and (22) as to the murder in count 10, and under subdivisions (a)(3), (21), and (22) as to the murders in counts 20 and 23.[3]

---

[2] Deandre Clayton was charged as an additional defendant on counts 1, 4, and 5, and Andrew Batres was charged as an additional defendant on count 10. Clayton was not tried with defendants. Batres was tried with defendants but had a separate jury. Clayton and Batres are not parties to this appeal.

[3] The alleged special circumstances were conviction for multiple murders in the same proceeding (§ 190.2, subd. (a)(3)), discharge of a firearm from a motor vehicle (*id.*, subd. (a)(21)),

The jury found defendants guilty of all charges and found all special circumstances as to the murder counts true. On each count that included firearm allegations the jury found at least one such allegation true, in some cases based on the defendant's conduct, and in some cases based on a principal's conduct. The jury found the gang allegations true except as to counts 13, 14, and 15, on which the jury could not reach agreement. The trial court declared a mistrial as to the gang allegations on counts 13, 14, and 15.

Defendants both moved for a new trial. The trial court denied the motions.

The trial court imposed two sentences of life without the possibility of parole on Parker, as well as an indeterminate sentence of 205 years to life and a determinate sentence of 14 years 8 months. The trial court imposed two sentences of life without the possibility of parole on Bonner, as well as an indeterminate sentence of 227 years to life and a determinate sentence of 29 years 8 months. The trial court awarded credits and imposed fines and fees.

## FACTUAL BACKGROUND

The majority of defendants' challenges on appeal pertain to the conduct of the proceedings rather than the specific counts and evidence against them. Thus, we do not set forth a detailed summary of the evidence in our Factual Background. To provide context, we do include a brief synopsis, in chronological order, of the circumstances underlying each count. To the extent more detail is necessary, we include it in the relevant section of the

and murder by a gang member to further the activities of the gang (*id.*, subd. (a)(22)).

4

Discussion, *post*.  In presenting this synopsis, we draw every inference in favor of the judgment.

Defendants were members of the Denver Lane Bloods gang. On January 17, 2016, defendants stole a vehicle from Edward F. at gunpoint (counts 2, 3, 7, 9).  Approximately 35 minutes later, defendants used Edward F.'s vehicle to perpetrate a drive-by shooting at several persons standing in front of a liquor store, wounding Elliot W. (counts 1, 4, 5).  The liquor store was in the territory of the Hoover Criminals, a rival gang to the Denver Lane Bloods.

On February 21, 2016, Bonner fired multiple shots from his vehicle at a vehicle occupied by Nathaniel Ancar and Lateshia W., killing Ancar (counts 23, 24, 25).

On March 18, 2016, Parker fired a gun from his vehicle, killing Kaelen Warren, who was riding past on a minibike (counts 20–21).

On March 20, 2016, defendants approached several individuals and displayed their handguns.  One of the individuals shot at defendants, who returned fire (count 17).  The area was claimed by Crip gangs, rivals to the Denver Lane Bloods.

On March 21, 2016, around 1 p.m., Bonner entered the motel room of Deon E. and robbed him at gunpoint (counts 13, 14, 15).

On March 21, 2016, at around 11:20 p.m., defendants shot and killed Steven Johnson (count 10).  The victim was affiliated with the Hoover Criminals, and the area in which he was killed was claimed by that gang.

The various gun possession counts (counts 7, 8, 11, 12, 16, 18, 19, 22, 26) were in connection with the above offenses, that is,

one or both defendants had a firearm at the time they committed the other offenses.

## DISCUSSION

### A. There Was Sufficient Evidence To Support Bonner's Convictions for the Attack on Ancar and Lateshia W.

Bonner argues that the prosecution "failed to prove that [Bonner] committed, or was involved in, any crime against Ancar or [Lateshia W.]," the victims of the vehicle-to-vehicle shooting on February 21, 2016. Bonner thus challenges his convictions on counts 23 through 26—the murder of Ancar, the attempted murder of Lateshia W., shooting at an occupied vehicle, and possession of a firearm by a felon. We reject these challenges.

#### 1. Standard of review

" 'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts

6

upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*).)

### 2. Evidence presented at trial

Lateshia W. testified that around 9 p.m. on February 21, 2016, her fiancé Ancar was driving his Chevy Tahoe with Lateshia W. in the passenger seat. While they were stopped at a traffic light, a car pulled up to the passenger side of the Tahoe. Lateshia W. thought this was unusual because there was only one lane traveling in that direction, meaning the other car had moved up between the Tahoe and the curb.

Lateshia W. saw a person staring out the window of the car at them.[4] She brought this to Ancar's attention. Ancar did not say anything, but reclined Lateshia W.'s seat back. When the light turned green, Ancar "started speeding down the street." Lateshia W. heard gunshots, and the Tahoe crashed. Lateshia W. saw that Ancar was bleeding from his forehead and

---

[4] Lateshia W.'s testimony regarding the staring person was confusing. She first said the person was "staring out of the passenger's side of the driver's side of the vehicle." Later, she stated the person was staring out of the passenger window, and she could not see the driver. This would appear to be inconsistent with her earlier testimony that the shooter's car had pulled up on the passenger side of the Tahoe, between the Tahoe and the curb, in which case the passenger side window of the shooter's car would be facing away from the Tahoe.

7

was not responsive. A forensic pathologist testified that Ancar had died from a gunshot wound to his temple.

During the investigation, detectives showed Lateshia W. photographs of possible suspects but she was not able to identify the shooter. At defendants' preliminary hearing, Lateshia W. similarly testified she could not identify anyone in the courtroom as the shooter. After the hearing, however, she sent a text message to a detective stating that she thought she recognized someone in the courtroom. At trial, she identified Parker, not Bonner, as the person she believed she recognized at the preliminary hearing.

The jury also heard the testimony of another eyewitness, Samantha D. Just before the shooting, Samantha D. was sitting in her car at the traffic light behind another car, with an SUV ahead of that car. The car in front of her steered into the bike lane and pulled up next to the SUV. The car's driver fired several shots, after which the SUV hit a parked van and then rammed into a fence.

Samantha D. testified she could see the car's driver in profile through the back window of his car, and could also see him reflected in the side mirror. He was a tall, muscular black man. When shown a six-pack of photographs by detectives on April 13, 2016, she identified Bonner as the shooter, and identified him again at trial.

The prosecution presented surveillance video showing a vehicle following Ancar's Tahoe, the Tahoe crashing, and the other vehicle continuing on. A detective testified that Bonner was arrested a month after the shooting while driving an Infiniti that matched the vehicle in the surveillance video. Samantha D.

also identified a photograph of the Infiniti as the vehicle involved in the shooting.

Cell tower records indicated that Bonner's cellphone was in the area of the shooting shortly before the shooting occurred. A firearms examiner testified that .380 caliber shell casings recovered from the scene had been fired from the same weapon as casings recovered from the shootings of Elliot W. and Johnson.

### 3.    Analysis

The record discloses sufficient evidence to uphold Bonner's convictions on counts 23 through 26. Samantha D. identified Bonner, both to police and at trial, as the man she witnessed shoot at the Tahoe. Her testimony was corroborated by cell tower records placing Bonner near the scene of the crime, and surveillance footage of the shooter's vehicle that resembled the Infiniti in which Bonner later was arrested.

Bonner notes that Lateshia W. testified it was Parker, not Bonner, who fired at the Tahoe, and argues that given the conflicting evidence, the jury could not have concluded beyond a reasonable doubt that Bonner was the shooter. Bonner suggests that Lateshia W.'s identification was more credible, given that she saw both Bonner and Parker at the preliminary hearing and "made a point to identify Parker and *not* [Bonner]." Bonner further suggests Samantha D.'s identification was unreliable because she testified she was "not looking for details" when she looked at the shooter's vehicle, and saw him only through his side mirror.

As an initial matter, Samantha D. made clear at trial she did not solely view Bonner in the side mirror, but also saw him in profile through the back window of his car. Regardless, " ' "[c]onflicts and even testimony [that] is subject to justifiable

suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Penunuri*, *supra*, 5 Cal.5th at p. 142, first bracketed insertion added.)  The jury was aware of the evidentiary issues raised by Bonner here, including the conflict between Samantha D.'s and Lateshia W.'s testimony, and concluded Bonner was the shooter.  Under the applicable standard of review, we cannot second-guess that conclusion.

## B.    Bonner Fails To Show Prejudice From the Trial Court's Permitting the Prosecution To Impeach a Defense Witness With Her Pending Criminal Charge

Bonner contends the trial court erred by permitting the prosecution to impeach a defense witness, Dominique M., with a pending criminal charge.  He asserts that, as a result of the trial court's ruling, the witness invoked her right against self-incrimination and refused to testify, thus depriving him of potentially exonerating evidence.  As we explain below, Bonner fails to show that Dominique M. would have testified absent the trial court's ruling, and thus fails to establish prejudice.

### 1.    Background

At trial, Bonner's counsel indicated he would call Dominique M. as a witness.  Based on Dominique M.'s interview with Detective Stacey Szymkowiak of the Los Angeles Police Department, Bonner's counsel contended she could testify that on February 21, 2016, the date of Ancar's murder, Bonner did not have access to the Infiniti in which he later was arrested.

The prosecutor stated his intent to impeach Dominique M. with statements she made in an earlier trial.  Specifically, the

prosecutor contended Dominique M. falsely denied being in a gang and downplayed the significance of a letter she received asking her to present false testimony in that earlier trial.

The trial court ruled that the prosecutor could question Dominque M. about her testimony in the earlier trial but could not introduce the letter itself unless Dominique M.'s testimony in the instant case made its contents relevant.

Bonner's counsel noted that Dominique M. also had a pending felony case against her. The trial court asked the prosecutor if he intended to impeach her with that pending charge. The prosecutor asked to table the question until he had reviewed the police report concerning the charge.

The next morning, Dominique M. appeared with her public defender, Sharonda Bradford. It appears there had been an earlier off-the-record discussion regarding Dominique M., because Bradford stated almost immediately that Dominique M. "is not going to testify," and Bonner's counsel asked for an opportunity "to put on the record my objection to the procedure and the testimony that, I believe, would have been elicited from [Dominique M.] had the court not permitted the district attorney to go into her pending case." This all occurred before the prosecutor had stated on the record an intention to impeach Dominique M. with her pending charge, and before the trial court ruled on the record whether to allow that impeachment.

The trial court then proceeded to "make a record of [the impeachment] issue," and confirmed that the prosecutor intended to impeach Dominique M. with the conduct underlying her pending charge, which was an assault with a gang enhancement allegation.

Bonner's counsel argued that Dominique M. could provide testimony that could exonerate Bonner of the Ancar murder.[5] Invoking Evidence Code section 352, he contended that "the potential prejudice and the [e]ffect on Mr. Bonner's right to present a complete defense outweighs the minimal values of impeaching someone with facts, or alleged facts, from a pending case that are contained in a police report."

Bonner's counsel then stated for the record the testimony he believed Dominique M. could provide, based on her police interview. Bonner's counsel summarized the interview in relevant part as follows: At the time of Bonner's arrest, Dominique M. was his girlfriend. She acknowledged Bonner was a member of the Denver Lane Bloods gang, and her brother Kelvin C. used to belong to the gang as well. She identified the Infiniti in which Bonner was arrested as her brother's car. Her brother left the car with her when he went to Missouri. Dominique M. remembered her brother left the same day she sought treatment for a mouth abscess, and police recovered records indicating that occurred on March 18, 2016.

---

[5] Bonner's counsel also claimed Dominique M. could provide evidence to exonerate Bonner of Johnson's murder, but did not elaborate. In Bonner's motion for a new trial, he argued that Dominique M. could have testified regarding calls and an encounter she had with Bonner the night of Johnson's murder that, Bonner contended, would suggest he was not present at Johnson's murder. Bonner does not renew this argument on appeal. Rather, he argues that Dominique M.'s testimony regarding his access to the Infiniti would exonerate him not only of Ancar's murder, but also Johnson's. This argument fails because the evidence showed the perpetrators of Johnson's murder used a Mercedes, not an Infiniti.

Dominique M. lived in the same house as her brother and was not aware of him ever lending the car to anyone prior to leaving it in her care. She allowed Bonner to drive it on March 22, 2016, the day of his arrest, but this was the only time he ever had the car.[6]

The prosecutor reiterated that he had evidence that Dominique M. lied when she denied in the earlier trial that she was a gang member. The prosecutor then provided additional detail about Dominique M.'s pending criminal case. She and three other individuals allegedly attacked a 14-year-old girl after the girl denied being a member of a particular gang, then attacked the girl's father and brother when they tried to

---

[6] The record on appeal contains notes taken by the detective that interviewed Dominique M., which largely corroborate Bonner's counsel's summary. According to the notes, Dominique M. stated the car was her brother's and he left it with her when he went to Missouri at the end of February or beginning of March. She had been Bonner's girlfriend for a couple of months. She let Bonner drive the car the day of his arrest, but that was the only day he did so, and he had no way to get the keys at any other time. She did not know if anyone else drove her brother's car prior to him leaving it with her. Although her brother knew Bonner, he would not have lent him the car.

When asked if she could better pinpoint the date her brother left, Dominique M. stated she went to the hospital that day with a swollen jaw; the notes indicate the police found medical records from that hospital visit in the Infiniti, although the notes do not indicate the date of those records.

Dominique M. stated that Bonner was a member of the Denver Lane Bloods gang, and her brother was a former member.

The interview notes do not appear to refer to anything pertaining to the Johnson murder.

13

intervene. One suspect had a knife and stabbed at least one victim. The attackers yelled, "On Lanes," which referred to the Denver Lane Bloods gang.

The trial court cited case law for the proposition that assault with a deadly weapon or by means of force likely to result in great bodily injury was a crime of moral turpitude, and although Dominique M. had not yet been convicted, the court would permit the prosecutor to question her about her pending case for purposes of impeachment, as well as "any issues of bias [or] gang membership." Bradford stated again that if Dominique M. was called to testify, she would "invoke the Fifth Amendment right" "on the advice of counsel."

Dominique M. then took the stand outside the presence of the jury. Bonner's counsel asked her, "Do you have a brother named Kelvin [C.]?" Dominique M. consulted with her counsel, then stated, "On advice of counsel, I refuse to answer the question and invoke my Fifth Amendment right." Bonner's counsel asked if Dominique M. recalled being interviewed by Detective Szymkowiak regarding lending her brother's car to Bonner. Dominique M. again refused to answer on the same ground.

The trial court asked Dominique M. if she intended to refuse to answer any question asked by Bonner's counsel, and she said yes. The prosecutor then asked her if she had access to her brother's car before he left for Missouri. She again refused to answer. The trial court excused her.

### 2. Analysis

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion

14

under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) Evidence Code section 352 grants the trial court discretion to exclude otherwise admissible evidence if, inter alia, "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." We review the trial court's admission of impeachment evidence for abuse of discretion. (*People v. Turner* (2017) 13 Cal.App.5th 397, 408.)

Bonner does not dispute that assault with a deadly weapon or by means of force likely to cause great bodily injury is a crime of moral turpitude for purposes of impeachment. (*People v. Rivera* (2003) 107 Cal.App.4th 1374, 1381; *People v. Elwell* (1988) 206 Cal.App.3d 171, 175.) Bonner asserts, however, that the trial court's decision to allow the prosecutor to impeach Dominique M. with her pending assault charge resulted in her choosing not to testify. This, he contends, deprived him of his constitutional right to confront witnesses and present a defense, and was also an abuse of discretion under Evidence Code section 352.

Assuming arguendo the trial court's ruling was in error, a question we do not decide, we nonetheless reject Bonner's challenge because he fails to show prejudice. Specifically, he fails to show that Dominique M. would have testified had the trial court excluded the evidence of her pending charge.

Dominique M. was accused of participating in an assault for the benefit of the Denver Lane Bloods. Any testimony she gave in the instant case that linked her to that gang could be used to incriminate her in her own proceeding. Such testimony would be unavoidable were she to testify on behalf of Bonner, even had the trial court barred the prosecution from cross-examining her about her pending charge. For example, she

15

would have to testify that she was romantically involved with Bonner, whom she had told police she knew to be a member of the Denver Lane Bloods. She would be asked about her brother as well, whom she had told police also was a former member of the gang.

The prosecution, moreover, had stated its intent to impeach Dominique M. with evidence that she was a gang member but had lied about it in an earlier trial. Regardless of the trial court's ruling concerning her pending charge, therefore, Dominque M. would face questions about her gang membership, an issue that would impact her pending case.

Dominique M.'s counsel stated from the outset that Dominique M. would refuse to testify, before the trial court had ruled on the record whether to permit the prosecution to impeach her with her pending charge. Similarly, on advice of counsel, Dominique M. refused even to acknowledge she had a brother, that she had access to his car, or that she had been interviewed by police about lending the car to Bonner. This record supports our conclusion that Dominque M. would have invoked her right against self-incrimination regardless of the trial court's ruling on impeachment with the pending assault charge. In the absence of any prejudice, Bonner's challenge fails.

## C. The Trial Court Did Not Abuse Its Discretion By Ordering Defendants Restrained With Stealth Belts

Defendants contend the trial court abused its discretion by ordering them restrained in the courtroom with so-called stealth belts. We disagree.

16

### 1. Background

On August 15, 2019, just before jury selection began, the trial court declared the proceedings "a high-security case." The trial court referred to defendants' disciplinary records while in custody in the county jail, noting reports of insubordination, fighting, assaults, and possession of shanks. The court also referred to incidents in which audience members had gotten into fights in the hallway. The court noted, however, that defendants had been respectful and conducted themselves appropriately while in the courtroom.

On October 7, 2019, weeks into trial, counsel for codefendant Batres reported that defendants had threatened Batres that morning while on the bus taking them from jail to court. According to Batres's counsel, defendants said they would kill Batres if he did not take the blame for the Johnson murder. The trial court asked Batres if he had been threatened by both defendants that day, and Batres said, "Yes, I was."

The trial court referred back to its earlier findings regarding defendants' disciplinary records of assaults and shanks, and said the new threat against Batres was "the straw that breaks the camel's back." The court then found "a manifest need at this point to restrain" defendants. It determined that a "stealth belt" that "is not seen by the jurors" was the "least restrictive means" to do so.

Defendants' counsel objected. Bonner's counsel noted that the restraints would prevent defendants from standing when the jury entered, which "creates an image of disrespect." He further argued that Batres was untrustworthy, that counsel had not had an opportunity to question Batres about the supposed threats,

and that Bonner had been well-behaved throughout the proceedings. Parker's counsel joined in these arguments.

The trial court stood by its ruling to restrain defendants with stealth belts. It acknowledged defendants' respectful conduct in court but believed there was a manifest need for restraints based on their conduct outside the courtroom, including the "direct information" from Batres that he was threatened.

Bonner's counsel asked the trial court to order that no one stand when the jury entered, so defendants would not appear less respectful than the other participants. The court declined the request, stating, "The inability to stand up . . . was caused by the defendants. So, that's something they have to deal with."

### 2. Analysis

" 'Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." ' " (*People v. Young* (2019) 7 Cal.5th 905, 934 (*Young*).) The federal Constitution similarly prohibits use of visible shackles absent an essential state interest. (*Ibid.*) Justifications for restraints include " ' "evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court." ' " (*Ibid.*) " 'The trial court's decision to physically restrain a defendant cannot be based on rumor or innuendo. [Citation.] However, a formal evidentiary hearing is not required. [Citation.]' [Citation.] The trial court's determination is reviewed for abuse of discretion." (*People v. Williams* (2015) 61 Cal.4th 1244, 1259 (*Williams*).)

18

The record does not suggest any abuse of discretion here. The trial court found, based on defendants' disciplinary records and statements by Batres and his counsel, that defendants had " ' "possessed weapons in custody" ' " and " ' "threatened or assaulted other inmates," ' " all of which justified the use of restraints. (See *Young*, *supra*, 7 Cal.5th at p. 934.)

Defendants argue there was no evidence they behaved inappropriately in court. As *Young* makes clear, a manifest need for restraints may arise from out-of-court conduct, including conduct while in custody. (See *Young*, *supra*, 7 Cal.5th at p. 934 [manifest need may be based on threats to jail deputies, possession of weapons in custody, and threats or assaults towards other inmates].)

Bonner argues it would be "exceedingly unlikely" he would carry out a threat in court, given such conduct would be "entirely counterproductive" to his "interest in being acquitted at trial." Parker makes a similar argument. Under this rationale, restraints would never be justified for any defendant in a jury trial, all of whom have an interest in being acquitted. That of course is not the law, and our Supreme Court has upheld convictions despite the use of restraints. (See, e.g., *Young*, *supra*, 7 Cal.5th at p. 935.)

Bonner argues there was only a "rather general allegation" regarding the threat to Batres, and this was insufficient evidence to support restraints. Parker similarly argues that Batres's claim was "equivalent to rumor." Far from general allegation or rumor, Batres stated directly to the trial court that defendants had threatened him, and his counsel provided additional details. Defendants' disciplinary records further supported the trial court's decision.

19

Parker argues Batres's claim that defendants threatened him did not establish a manifest need for restraints because "Batres is known to be untruthful." Parker cites to portions of the record purportedly establishing Batres's lack of credibility. Bonner criticizes the trial court for not doing more to investigate and substantiate Batres's claims.

The trial court found Batres sufficiently credible, and we cannot question that determination on appeal. (*Penunuri*, *supra*, 5 Cal.5th at p. 142 [" ' "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' "].) The trial court was not required to conduct further investigation; courts may make a determination of manifest need without conducting a formal evidentiary hearing. (*Williams*, *supra*, 61 Cal.4th at p. 1259.)

Parker further argues that defendants' disciplinary records were insufficient to show a manifest need for restraints because the trial court was aware of those records at the start of trial and did not order defendants restrained at that time. Assuming arguendo the trial court could not rely solely on the disciplinary records, the threat to Batres was a sufficient additional reason to justify restraining defendants later in the trial.

Parker questions whether the trial court truly saw a manifest need given that it did not order additional security measures outside the courtroom where, Parker contends, violence against Batres was more likely to occur. Our analysis is limited to assessing whether the record supported a need for restraints in the courtroom. As discussed, the evidence cited by the trial court was sufficient for that purpose.

Parker contends that, assuming the restraints were proper, the trial court erred by not instructing the jury to disregard the use of restraints.  It is true that when a defendant is shackled in *visible* restraints, the trial court " 'shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt.  However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided.' "  (*People v. Bell* (2019) 7 Cal.5th 70, 124, quoting *People v. Duran* (1976) 16 Cal.3d 282, 291–292.)  In the instant case, the trial court ordered defendants restrained by stealth belts invisible to the jury.  Defendants did not request any jury instruction regarding the belts, and thus the court had no obligation to provide such an instruction.

Parker argues that although the jurors could not see the stealth belts, "the restraint of the defendants was visible" because "they were no longer able to stand."  Therefore, he contends, the trial court had a sua sponte duty to admonish the jury about the belts.  Our Supreme Court rejected a similar argument in *People v. Manibusan* (2013) 58 Cal.4th 40, which concerned a defendant restrained with an electric shock belt.  (*Id.* at pp. 84–85.)  Although the defendant requested no instruction concerning the belt, he argued on appeal the trial court nonetheless should have instructed the jury sua sponte to " 'disregard the defendant's demeanor that may be attributed to the presence of a device capable of causing permanent injury or death upon accidental activation.' "  (*Id.* at p. 86.)  The Supreme Court, citing *Duran*, concluded any such instruction would be

21

inappropriate absent a request from the defendant, given that it might draw undue attention to the restraint. (*Ibid.*)

Similar to the defendant in *Manibusan*, Parker argues not that jurors could see the restraints themselves, but that they might have noticed a change in his conduct attributable to the restraints, namely his inability to stand. As in *Manibusan*, the trial court reasonably could conclude that raising the issue with the jury created a greater risk of prejudicing defendants than staying silent. Indeed, the trial court expressly stated it was not inclined to raise the issue because "I think that will highlight the issue more than anything else." Defense counsel did not contest this conclusion or request an instruction. Under these circumstances, the trial court did not err by choosing not to give an instruction regarding the belts.

Because the record supports the trial court's finding of a manifest need to restrain defendants with stealth belts, we need not determine if that ruling was prejudicial. (See *People v. Bryan, Smith and Wheeler* (2014) 60 Cal.4th 335, 392 ["Given the particularized finding of need in this case, the possibility that some jurors may have perceived defendants were wearing some type of [restraining] device does not establish a constitutional violation."].)

## D.  The Trial Court Did Not Abuse Its Discretion By Admitting Evidence of Defendants' Gang Membership

Defendants argue the trial court abused its discretion by allowing the prosecution to introduce cumulative and excessive evidence of their gang membership. We disagree.

### 1.    Background

In his opening statement, Bonner's counsel stated that Bonner was "a member of the Denver Lane Bloods.  No question about it.  You're going to see tattoos.  You're going to see pictures, and you're going to know it beyond any doubt whatsoever." Parker's counsel did not make a similar concession.

Later, defense counsel objected to the admission of videos from Bonner's Facebook account on several grounds, including that they were cumulative to other evidence, and in Bonner's case, unnecessary given that his counsel conceded Bonner's gang membership in the opening statement.  The trial court excluded some videos as unduly prejudicial or duplicative but allowed two showing Parker and Bonner singing together while throwing gang signs, one of Bonner throwing gang signs, and one in which Bonner displayed his tattoos.

Later, defense counsel objected to the admission of printouts of Bonner's Facebook postings and messages, again on numerous bases including that the evidence was cumulative.  The printouts consisted of three exhibits.  Exhibit 114 consisted of 31 pages of Facebook postings and messages primarily from October and December 2015 and February 2016, some of which included photographs, examples of which we describe further below.  Exhibit 115 consisted of two pages of a Facebook exchange from February 23, 2016.  Exhibit 116 consisted of 20 pages of Facebook messages primarily from September and October 2015 and January and February 2016.  The trial court admitted the printouts with the exception of one post it found highly prejudicial.

The videos and Facebook printouts were presented to the jury during the testimony of Detective Christian Mrakich, the

prosecution's gang expert. Mrakich explained that Bonner's name on Facebook was "HKBrayz," with the "HK" signifying "Hoover Killer," a reference to the Hoover Criminals, a main rival to the Denver Lane Bloods. Another name connected to Bonner included "Figueroa," a reference to turf claimed by the Denver Lane Bloods.

Mrakich explained how the Facebook posts and messages indicated defendants' affiliation with the Denver Lane Bloods. For example, he interpreted language used in the Facebook posts and messages to indicate either Bonner's fealty to the Denver Lane Bloods or disrespect to rivals of that gang, including the Hoover Criminals. Posts referred to a "homie" called "Keylow," whom Mrakich explained was Parker. Some posts referred to firearms, and in three posts, Parker referred to himself or his friends as a "shooter" or "shooterz." In several posts, Bonner purported to be in rival gang territory. In one exchange, someone reported being shot by the Hoover Criminals.

The Facebook posts included some photographs of Bonner wearing clothing referencing the Denver Lane Bloods, making hand gestures disrespectful to the Hoover Criminals, or standing in front of Denver Lane Bloods graffiti. Parker was in one of the photographs also making gestures disrespectful to the Hoovers Criminals. Another photograph showed Bonner and Parker with other individuals Mrakich identified as Denver Lane Bloods members. Mrakich interpreted the Facebook messages in exhibit 116 as Bonner attempting to obtain a gun.

Mrakich testified regarding the Facebook videos, which he explained showed Bonner, or Bonner and Parker together, throwing gang signs, and Bonner displaying his tattoos. He also analyzed for the jury photographs of Bonner's tattoos, and

24

explained how the tattoos were connected to the Denver Lane Bloods. Mrakich stated that Parker's tattoos were not gang related.

Mrakich opined that Bonner was a member of the Denver Lane Bloods based on his tattoos, Facebook posts and messages with gang jargon, photographs and videos of Bonner displaying gang signs, Bonner's association with other gang members, and recorded calls to which Mrakich had listened in which Bonner used gang jargon. Mrakich further opined that Bonner was an active gang member given how active he was on Facebook with gang-related messages.

Mrakich similarly opined that Parker was an active member of the Denver Lane Bloods based on Bonner's Facebook postings referring to Parker, the photographs and videos, Parker's association with other gang members, and recorded calls to which Mrakich had listened.

### 2. Analysis

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' [Citation.]" (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*), final bracketed insertion added.) We review a trial

court's decision to admit gang evidence for abuse of discretion. (*Ibid.*)

On appeal, defendants do not take issue with any particular items of gang evidence, instead raising a general challenge that the gang evidence was cumulative and unduly prejudicial. Bonner argues that, because his counsel conceded in opening argument that Bonner was a gang member, the evidence concerning his gang membership had minimal probative value and instead served only to portray him as violent and dangerous. Even if the evidence had some probative value, he argues, "the evidence was cumulative—quite simply, the prosecution did not need to present so much gang evidence." Similarly, Parker claims "[t]he highly inflammatory nature of the repetitive discussion of gang membership, with accompanying social media photos and posts, went beyond its probative value and rose to the level of inadmissible character evidence."

As an initial matter, Bonner's counsel's concession during oral argument did not bar the prosecution from presenting the case as it saw fit. (*People v. Dykes* (2009) 46 Cal.4th 731, 785 ["Ordinarily the prosecution ' "cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." ' [Citations.]"].)

Nor did the concession negate the probative value of the evidence. The prosecution sought to prove not only that Bonner was a member of the Denver Lane Bloods, but also that he committed the charged offenses "for the benefit of, at the direction of, or in association with" the gang, a necessary element of the gang enhancement. (§ 186.22, subd. (b).) Similarly, one of the special circumstances underlying the murder charges required proof that Bonner committed the crime while "an active

26

participant" in the gang in order "to further the activities of the criminal street gang."  (§ 190.2, subd. (a)(22).)

Bonner's counsel's concession that Bonner was a gang member did not satisfy these additional elements.  The gang evidence, on the other hand, was highly probative as to these elements, as it tended to show defendants' active participation in and enthusiasm for the gang and their antipathy and aggression towards rival gangs.  The evidence also was probative as to defendants' motive for carrying out the charged crimes, and to the connection and friendship between defendants, whom the prosecution sought to prove acted together in committing many of the charged offenses.

Apart from Bonner's contention that his counsel's concession rendered the gang evidence unnecessary, defendants do not explain why any particular item of gang evidence was cumulative or unduly prejudicial.  Instead, they claim there simply was too much of it.  Such an argument is insufficient on appeal.  (See *Coneal*, *supra*, 41 Cal.App.5th at p. 963 ["Absent an analysis of specific [gang] evidence, reference to volume alone is meaningless."].)

We disagree, moreover, that the evidence was excessively cumulative.  As discussed, the evidence served to illustrate not only defendants' membership in the gang, but also their active participation in and enthusiasm for the gang, their antipathy towards rival gangs, and their association with one another.  Different evidence supported different points, and it therefore is misleading to lump it all together as cumulative or duplicative gang evidence.  Even when some evidence was repetitive, such as the multiple photographs and videos of Bonner and Parker together throwing gang signs, it was probative to establish that

27

defendants engaged in the conduct over a period of time, and not just on one or two isolated occasions.

Defendants also fail to show the gang evidence was unduly prejudicial. This was a case in which defendants' gang membership was a central theme. They were accused of committing a series of violent crimes over the course of several months, often together, on behalf of their gang. It therefore was appropriate that the prosecution would emphasize repeatedly defendants' gang affiliation, and would offer evidence that defendants were enthusiastic and loyal gang members. In the absence of specific argument from defendants as to why particular items of evidence were unduly prejudicial, we cannot conclude the trial court abused its discretion by admitting the gang evidence.

## E. The Trial Court Did Not Err In Admitting Edward F.'S Testimony From the Preliminary Hearing

Parker challenges the admission at trial of the preliminary hearing testimony of Edward F., the carjacking victim. Bonner joins in the argument. We conclude there was no error.

### 1. Background

At defendants' preliminary hearing, Edward F. testified that while he was fueling his white Volkswagen Beetle at a gas station, two men approached him. The men asked where he was from, and stated they were Denver Lane Bloods. One of the men reached for Edward F.'s necklace, and Edward F. slapped the man's hand away. The man drew a gun, and Edward F. fled. One or both of the men then drove off in Edward F.'s Volkswagen. According to the police report, Edward F. told the police one of

28

the men had a cast on his arm, but Edward F. testified he did not remember saying that.

Both Parker's and Bonner's counsel cross-examined Edward F. at the preliminary hearing.

At trial, the trial court found that despite all reasonable efforts, the prosecution had been unable to secure the presence of Edward F. to testify. As a result, the trial court permitted the prosecution to read to the jury Edward F.'s preliminary hearing testimony, including defendants' counsels' cross-examination.

In addition to Edward F.'s prior testimony, the prosecution presented surveillance video from the gas station at the time of the carjacking, which among other things showed the two perpetrators arriving in a black Volkswagen Beetle with one white fender and a missing gas cap. Cellphone location data placed Parker's and Bonner's phones near the gas station around the time of the carjacking.

The prosecution also played a recording of Edward F.'s 911 call reporting that two black men, one with a cast, had taken his car at gunpoint. The jury heard testimony from police that Edward F. had made a similar report to investigators. A police officer testified he encountered Parker on two occasions a few days after the carjacking, and both times Parker stated that he had broken his arm and had recently had the cast removed.

A woman who was Parker's girlfriend at the time of the carjacking testified she had a black Volkswagen Beetle with a missing gas cap and one fender lighter than the rest of the car, and identified the car in the surveillance video as her Beetle. She testified that Parker sometimes drove her car. She remembered that about three years earlier (that is, 2016), Parker had a cast on his hand.

29

## 2.    Analysis

Parker does not dispute the finding that Edward F. was unavailable despite the prosecution's reasonable efforts but contends the admission of Edward F.'s earlier testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution.

" 'A defendant has a constitutional right to confront witnesses, but this right is not absolute.  If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 291 (*Valencia*).)  "[F]or the prior testimony to be admissible, the defendant must have had the opportunity to cross-examine the witness at that hearing with an interest and motive similar to that which defendant has at the hearing at which the testimony is admitted." (*Id.* at p. 292.)

Although both Parker's and Bonner's counsel cross-examined Edward F. at the preliminary hearing, Parker argues his counsel lacked motive and opportunity to cross-examine similar to trial because "the purpose of a preliminary hearing is to show 'probable cause'[,] not guilt beyond a reasonable doubt." Parker claims that "[d]uring a preliminary hearing counsel is constrained by the court to only inquir[e] in relation to testimony and evidence that goes to probable cause.  A full and complete cross-examination of a witness is not allowed."

In support, Parker quotes a footnote from *People v. Johnson* (1968) 68 Cal.2d 646 (*Johnson*), which interpreted the United States Supreme Court's decision in *Barber v. Page* (1968) 390 U.S. 719 to "cast doubt on the widely held assumption that

30

cross-examination at a preliminary hearing, as distinguished from a trial, is constitutionally adequate to permit subsequent use of the witness' direct testimony under the 'former testimony' exception." (*Johnson*, at p. 659, fn. 9.) *Barber*, as quoted in *Johnson*, stated, " 'The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.' " (*Johnson*, at p. 659, fn. 9, quoting *Barber*, at p. 725.)

Johnson did not concern the admission of preliminary hearing testimony, but grand jury testimony provided in the absence of the defendant or defense counsel, with no opportunity for cross-examination. (*Johnson*, *supra*, 68 Cal.2d at p. 654.) *Johnson*'s footnote regarding *Barber* therefore would appear to be dicta.

More important, the United States Supreme Court made clear in *California v. Green* (1970) 399 U.S. 149 that, despite the language in *Barber*, preliminary hearing testimony could be admissible at trial in the case of an unavailable witness. (*Green*, at p. 165.) In that case, the witness at issue had testified under oath at the preliminary hearing, the defendant was represented by counsel who had the opportunity to cross-examine, "and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings." (*Ibid.*) The court concluded these "circumstances closely approximat[ed] those that surround the typical trial," and therefore satisfied the constitutional right to confrontation. (*Ibid.*) The court

acknowledged the language in *Barber* that a preliminary hearing "is ordinarily a less searching exploration into the merits of a case than a trial," but noted that *Barber* also "recognized that 'there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable . . . .' " (*Green*, at p. 166.)

Consistent with *Green*, our Supreme Court has upheld the admission of preliminary hearing testimony when the witness is unavailable at trial. (*Valencia, supra*, 43 Cal.4th at pp. 293–294.) Only "in an extraordinary case" would it be " ' "necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant." ' [Citation.]" (*Id.* at p. 294.) Thus, we reject Parker's suggestion that *Johnson* is a per se bar to the use of preliminary hearing testimony at trial.

Apart from the citation to *Johnson*, Parker offers no support for his contention that his counsel could not conduct an adequate cross-examination of Edward F. at the preliminary hearing. Indeed, he does not discuss the specifics of Edward F.'s testimony or his counsel's cross-examination at all. Parker therefore has failed to show this is "an extraordinary case" requiring further scrutiny of the preliminary hearing to determine if it satisfied defendants' confrontation rights. (*Valencia, supra*, 43 Cal.4th at p. 294.)

Parker's argument also fails because he makes no effort to demonstrate prejudice. He does not explain how Edward F.'s testimony affected the case, and how the outcome might have been different had the trial court excluded the testimony, despite

the other evidence presented.  Again, Parker does not discuss the contents of Edward F.'s testimony at all.  Absent a showing of prejudice, Parker's challenge fails even assuming arguendo the trial court erred in admitting Edward F.'s testimony.

## F.     Parker Fails To Show His Counsel Was Ineffective

Parker claims his trial counsel was constitutionally ineffective in a variety of ways.  We reject this challenge.

To demonstrate ineffective assistance of counsel, Parker " 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).)  " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.]' " (*People v. Campbell* (2020) 51 Cal.App.5th 463, 504.)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.]  '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' [Citation.]" (*Johnsen, supra*, 10 Cal.5th at p. 1165.)

We discuss each of Parker's contentions in turn.

### 1. Parker fails to show counsel was ineffective for failing to retain experts

Parker contends his counsel was ineffective because counsel did not retain or consult with a "gang expert," a "cellphone GPS expert," or a "DNA expert." Parker argues a gang expert potentially could have countered the prosecution's gang expert's opinion that Parker's offenses were committed for the benefit of the gang or could have undercut some of the prosecution's assertions about gang culture. He claims a cellphone GPS expert could have explained that the cell tower location data introduced against Parker was not reliable. He asserts a DNA expert could have tested the physical evidence and confirmed that Parker's DNA was not on it.

Parker does not identify anywhere in the record " 'affirmatively disclos[ing] [that] counsel had no rational tactical purpose' " for not calling these experts, or indicating that " 'counsel was asked for a reason and failed to provide one.' " (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.) Nor do we agree there can " 'be no satisfactory explanation.' " (*Ibid.*) For example, Parker does not identify any evidence in the record to support his claim that his counsel did not even consult with any experts, so it is conceivable counsel did so and concluded the experts would not provide helpful testimony. It is also conceivable counsel believed undercutting the prosecution's experts through cross-examination would be more fruitful than calling his own experts.

Parker's speculation as to what experts might have testified, moreover, is insufficient to establish prejudice. Apart from broad generalities, Parker does not explain what specific evidence the experts might have provided. Indeed, it is pure conjecture that his counsel could have found experts that would

34

have provided testimony useful to him.  We therefore cannot conclude that counsel was ineffective for failing to retain experts.

2. **Parker fails to show counsel was ineffective for not investigating or calling witnesses identified by Parker**

Parker contends his counsel was ineffective because he failed to investigate or call alibi and character witnesses.  He claims counsel "made no effort" in this regard, despite Parker repeatedly bringing potential witnesses to counsel's attention, and even misled Parker to believe counsel had interviewed witnesses when counsel in fact had not.  Parker asserts it was "a complete surprise" that counsel did not call a single witness because "as recent as that morning, defense counsel assured [Parker] that he had subpoenaed several of the witnesses [Parker] identified."

Parker provides no record citations in support of the contention that counsel failed to investigate or call witnesses identified by Parker.  Nor can we readily determine where in the vast appellate record, consisting of more than 25 volumes of reporter's transcript and 8 volumes of clerk's transcript, evidence in support of Parker's argument may be.  We therefore deem the challenge forfeited.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 939 (*Hoyt*) [claim of error forfeited by failure to support arguments with record citations].)

Parker also fails to show prejudice.  He does not identify the witnesses he claims his counsel should have called or explain what testimony those witnesses might have provided.  We therefore cannot assess what impact, if any, counsel's purported failure to call those witnesses had on the outcome of the trial.

35

### 3.    Parker fails to show counsel was ineffective based on counsel's poor relationship with Parker

Parker claims he had a "strained relationship" with his counsel and they disagreed over trial strategy and counsel's preparedness.  Parker contends he "did not receive timely information from defense counsel" and "could not get straight answers from defense counsel regarding the state of discovery." Parker claims counsel would inform him of one strategy and then do something different or nothing at all; when Parker brought this to counsel's attention, counsel "would always blow him off." Parker asserts that counsel eventually stopped explaining anything to him and would become angry if Parker asked questions.  Parker claims counsel told him counsel did not care what Parker thought or whether Parker agreed with counsel, and if Parker did not like what counsel was doing, Parker could represent himself.

Again, Parker fails to provide any record citations in support of the above assertions, and therefore forfeits his arguments based on them.[7]  (*Hoyt*, *supra*, 8 Cal.5th at p. 939.)

---

[7] Our own review of the record indicates that some of Parker's assertions in part F.3 here and the following part F.4 echo complaints he raised below in a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, which took place following closing arguments.  Parker complained that his counsel had done only "the b[are] minimum" in preparing his defense and had not put forth certain evidence or arguments Parker had suggested. Parker also reported that he and his counsel "got into it throughout the whole trial," culminating in counsel telling Parker, " 'Well, if you want to fight the case by yourself, do that.

Parker also fails to show that his purportedly poor relationship with counsel prejudiced his defense. He claims the relationship made Parker "feel like he was not able to participate in his own defense without losing his attorney in the middle of the trial." Assuming arguendo that was so, it does not establish that the defense mounted by counsel was unsatisfactory, or that the outcome might have been different had counsel gotten along better with Parker.

4. **The length and substance of Parker's counsel's arguments and filings do not establish ineffective assistance**

Parker claims his counsel was ineffective because he was "only willing to do the bare minimum in his representation of [Parker]." In support, he notes the brevity of his counsel's opening statement (approximately one page of the reporter's transcript) and closing argument (approximately 28 pages) in comparison to the prosecution's (approximately 36 and 116 pages, respectively).

A mere comparison of the length of arguments is insufficient to show ineffective assistance of counsel. The prosecution has the burden to prove every element, a burden the defense does not share, so it is unsurprising that the

---

I give you these papers, you fight by yourself.' " Parker's counsel did not corroborate any of Parker's assertions, instead stating he had tried to investigate all leads and incorporate Parker's suggestions into the closing argument. The trial court found that Parker's counsel had provided adequate representation and declined to replace him.

prosecution's arguments would be lengthier than the defense's arguments.

Parker also argues that the substance of counsel's opening statement and closing argument was deficient. He asserts that the prosecution's opening statement "laid out a detailed road map of the case, the players, and the evidence," whereas Parker's counsel merely "informed the jury that in a few months, at the end of the trial[,] defense counsel thought they would find [Parker] not guilty."

Again, given the burden of proof, we would expect the prosecution to use the opening statement to provide a roadmap for the jury, especially in a case with as many counts as this one. We would not expect the same of defense counsel. Parker, moreover, does not explain what specifically defense counsel should have said in opening and how that might have affected the outcome, and therefore fails to show prejudice.

Parker identifies points he contends his counsel "assured" him he would raise in closing argument but did not. Specifically, he contends his counsel should have argued that it would have been impossible for a deputy sheriff to have seen Parker discard a weapon, as the deputy claimed. Parker further contends that his counsel should have argued that when the deputy found the Mercedes involved in the Johnson murder, Parker's car was parked right next to it, and therefore there was a possibility that when the deputy claimed he saw Parker get out of the Mercedes, Parker in fact was getting out of his own car.[8]

---

[8] Parker again does not support his argument with record citations. Based on the statement of facts in his brief, we presume he is referring to the deputy sheriff who testified that he

38

As an initial matter, Parker's counsel did argue in closing that it would have been difficult for the deputy to see what he claimed to have seen, given that it was nighttime and the deputy was at a distance. Parker's counsel also emphasized at least twice that Parker's car was parked near the Mercedes. Thus, to the extent Parker's counsel assured Parker he would raise these points, it would appear he did so.

Also, again, Parker fails to show prejudice. Simply identifying two arguments his counsel could have made, or made more strongly, is insufficient without an analysis of how those arguments, and the evidence to which they pertain, fit in to all of the arguments and evidence heard by the jury. Without this analysis, Parker cannot establish that the outcome of the trial might have been different had his counsel acted differently.

Finally, Parker argues his counsel was ineffective because counsel filed a one-and-a-half page motion for a new trial, whereas Bonner's counsel filed a 17-page motion. This argument is meaningless without a discussion of the contents of the two motions, which Parker does not provide.[9] Nor does Parker

---

observed three black men getting out of a Mercedes and run away. The driver of the Mercedes got out shortly thereafter and ran behind a wall by a trash bin. The deputy approached the trash bin and saw a person he identified as Parker placing a black object on the ground. After the deputy's partner detained Parker, the deputy examined the area near the trash bin and "saw the pistol exactly where [Parker] leaned down and placed it."

[9] Parker's motion for a new trial asserted insufficiency of the evidence, stating, "The circumstantial nature of the evidence combined with the sheer number of charges as well as prejudicial

39

identify issues his counsel should have, but did not, raise in the motion for a new trial.  Regardless, Parker has had full opportunity to raise his challenges in this appeal, and we have concluded they are without merit.  Thus, his counsel's failure to raise those challenges in a new trial motion did not prejudice Parker.

## DISPOSITION

The judgment as to Cedrick Devontae Parker is affirmed. The judgment as to Deandray Bonner is affirmed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.          CRANDALL, J.*

---

gang-related evidence bolstered individual counts that were weak in evidence against him."  Bonner's motion was based on the imposition of stealth belts, admission of gang evidence, and the impeachment of Dominique M., all challenges we have considered and rejected in this appeal.  At the hearing on the motions, Parker's counsel joined Bonner's arguments concerning the stealth belts.

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40