Filed 1/5/24  P. v. Massaro CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN JOHN MASSARO,<br><br>    Defendant and Appellant. | C095690, C096278<br><br>(Super. Ct. Nos. 21-CR-30381,<br>21-CR-30915-01) |

Defendant Justin John Massaro hit a victim in the face with a hammer multiple times and was charged with attempted murder and related offenses.  While awaiting trial, Massaro offered his pickup truck and a power tool to a friend to testify that he saw the victim strike first.  The friend provided that false testimony as a defense witness in a pretrial hearing.  But at the trial itself, the *prosecution* introduced the friend's testimony along with a pretrial recorded phone call wherein the friend described the false testimony scheme and Massaro's role in it.  Testifying on his own behalf, Massaro claimed self-

1

defense and told the jury that the victim produced the hammer and tried to strike him with it first.

No one else saw the beginning of the incident when the hammer first appeared. The jury found Massaro not guilty of attempted murder, but guilty of the lesser included offense of attempted voluntary manslaughter.

In his appeal from that conviction (case No. C095690), Massaro challenges multiple evidentiary rulings, including rulings concerning in-court and out-of-court statements of the friend who provided false testimony. Massaro also claims prosecutorial misconduct in connection with the prosecutor's reference to "Nazi propaganda" in its closing argument to the jury. We conclude the trial court did not abuse its discretion in making the challenged evidentiary rulings and Massaro's claim of prosecutorial misconduct is forfeited on appeal due to inadequate briefing.

In a separate appeal from his convictions for bribing a witness (his friend) and suborning perjury (case No. C096278), Massaro contends there was insufficient evidence. We disagree.

Accordingly, we will affirm the judgments. We also will direct the clerk of the trial court to correct an abstract of judgment.

BACKGROUND

I

*The Attempted Murder Case*

A.  *The Victim*

The victim, Matthew P., began dating Massaro's ex-girlfriend, Michelle Saunders, in the fall of 2020. Matthew P. understood that Massaro and Saunders, though romantically separated, still lived together in a trailer. Though he was still intimate with his wife in January 2021, Matthew P. told Saunders he had not been intimate with her in seven years. Matthew P. testified his marriage was "off and on" and "complicated." He

2

acknowledged that his wife did not know the marriage was "off" in January 2021, as he never told her about his relationship with Saunders.

In January 2021, Saunders told Matthew P. via Facebook Messenger that Massaro wanted to kill him. In one of his replies to Saunders after she said Massaro wanted to kill him, Matthew P. wrote: "I'm not opposed to beating the crap out of a specific person." He was talking about Massaro but did not mean it. He wanted to comfort Saunders, who had indicated she was scared. Though he believed Massaro had threatened to kill him, Matthew P. did not believe Massaro would actually try to kill him. He did become afraid when Saunders told him Massaro had a shotgun and a grenade launcher.

Around 7:00 p.m. that same day, Matthew P. picked up Saunders from work. Their plan was to run an errand together, go to Saunders's home to get some of her clothes, and then rent a hotel room because Saunders did not feel safe at home. Moments after Matthew P. parked his car in front of Saunders's home, Massaro emerged from a carport. It was dark outside and there were no lights other than the headlights on Matthew P.'s car.

Massaro said he wanted to talk to Matthew P. Saunders went inside and Massaro sat in the front passenger seat and closed the door. As Matthew P. had turned off the overhead dome light that turns on automatically when a car door opens, the passenger compartment of the car did not illuminate when Massaro got in.[1]

On the night of the incident, Matthew P. had a toolbox in the backseat of his car because he had earlier tried to use its contents to repair Saunders's car. A photograph of the "ratchet set" toolbox was admitted as evidence. There was no hammer inside Matthew P.'s car before Massaro got in. Without warning, Massaro hit Matthew P. in the face with a hammer multiple times and told him he was dead. Though blood obscured

---

[1] Matthew P. always kept the overhead light off in his hybrid plug-in car because that used less battery power.

his vision, Matthew P. managed to grab the hammer, unbuckle himself, get out of the car, and throw the hammer away from the car. The two men later struggled on the ground. At one point they were choking each other simultaneously.

Surgeons removed pieces of bone from Matthew P.'s cracked skull and installed a plate in it. Matthew P.'s injuries from the incident caused him permanent double vision and a feeling of burning pins and needles throughout his body.

When asked at trial to reconcile his fear of Massaro with his decision to drive to the trailer that night, Matthew P. explained that Saunders told him Massaro had not been staying at the trailer for a while. He did not hit Massaro during the incident, and never even tried to hit him. He "couldn't see well enough to swing." When police arrived, Matthew P. heard Massaro say Matthew P. attacked first.

B.    *Michelle S.*

Saunders and Massaro dated for seven years and were the parents of a young child. They broke up in the fall of 2020, a few months after they bought a trailer together. Saunders did not ask him to leave, and Massaro sometimes slept in bed with her though they were not intimate. She and Matthew P. were dating by the end of December 2020.

Saunders and Massaro argued about Matthew P. in January 2021. On one occasion, Massaro woke her up when she was sleeping in bed. He had her phone in his hand and he was angry. Saunders understood Massaro had read messages on her phone to and from Matthew P. When Saunders said she loved Matthew P., Massaro said he would hurt him and — if she brought him to the trailer — he would kill him. Saunders described Massaro as "[c]learly" "bigger than" Matthew P., who was "small."[2]  Though

---

[2] Matthew P. weighed 125 pounds on the night of the incident.

she did not think Massaro was serious, Saunders conveyed Massaro's threats to Matthew P. because she wanted him to know how angry Massaro was.

On the day of the incident, when Saunders was leaving work to meet Matthew P. to run an errand, Massaro "crept from the corner" of a wall and yelled at her in anger about going with Matthew P. Massaro usually expressed anger at Saunders only in private. "But . . . that night, the parking lot heard it."

After the errand, Saunders asked her neighbor if Massaro was home because she "didn't want [Matthew P.] to drive [her] over there" if Massaro was there. The neighbor told Saunders it appeared Massaro was not home because his car was not there. In the months that Saunders lived with Massaro at the trailer he always parked his car in the driveway when he was home.

When Matthew P. pulled up to the trailer, Saunders did not see Massaro's car and believed he was not there. As soon as she opened the car door to get out, Massaro approached from the back of the carport and said he wanted to speak with Matthew P. "I'm not going to do anything," he assured her. "I just want to talk." He took his hands out of his pockets and held them up, palms outward. Matthew P. seemed to be fine with it, so Saunders went inside to get her stuff and told Massaro she was not staying at the trailer that night. While inside the trailer, Saunders heard a "faint boom." She looked out the window and saw Matthew P.'s car swaying back and forth.

C.    *James Ray*

During the prosecution's case, the trial court read to the jury the prior testimony of James Ray from a pretrial hearing. In that testimony read to the jury, Ray explained that he lived in the same trailer park where the incident occurred and knew Massaro as his neighbor and sort of as a friend. Regarding the incident, Ray saw Massaro get into Matthew P.'s car and sit down in the passenger seat. The overhead light in the passenger compartment was on when Massaro got in and the light stayed on. Before Massaro did anything to the driver, "the driver struck [Massaro] with something in his hand."

5

The trial court also read to the jury Ray's pretrial testimony that in spring 2021, after the incident and before the pretrial hearing, Ray was housed with Massaro in the same section of the Amador County jail in connection with a violation of probation case. One allegation in that case was that Ray had not been living where he said he was living. While in jail together, Ray and Massaro created and signed a document purporting to memorialize an oral agreement they had made that Ray could stay in Massaro's trailer for $300 a month. They backdated the document to December 1, 2020, and Ray gave it to his lawyer in an effort to defend himself against the violation of probation allegation.

Another portion of Ray's pretrial testimony the trial court read to the jury was Ray's testimony that he and Massaro never discussed their cases, and Massaro never asked him to testify in the attempted murder case.

D.      *Ray's Girlfriend and a Recorded Jail Telephone Call*

Ray's girlfriend testified at trial that on the evening of the incident, she and Ray were in a car together driving to their trailer when they saw Massaro and someone else on the ground. They were not present when the incident started, but they realized "there was a problem going on." The prosecution played for the jury an audio recording of a call between Ray and his girlfriend while he was in jail. Ray's girlfriend identified and confirmed that it was her voice and that of Ray in the audio recording. In that same spring 2021 jail telephone call, Ray says Massaro offered his truck and chainsaw as payment for Ray's testimony "that the guy in the car attacked[ ] [Massaro] first."

E.      *Massaro's Testimony*

Massaro testified that about 10 days before the incident he started sleeping around the corner from the trailer in his car so that Saunders "could have the place to herself so she wouldn't feel uncomfortable." The location was near a communal laundromat and relatively well lit. About a week before the incident, Saunders told him that she planned to introduce their son to Matthew P. Massaro asked if he could speak to Matthew P. because he was concerned about someone he did not know being around his son. A few

days before the incident he learned Matthew P.'s name during an argument in which Saunders complained Massaro was not remodeling the trailer fast enough. Massaro testified he never made any threats regarding Matthew P.

On the day of the incident, Massaro was not upset in the parking lot when Saunders got off work and declared she was going to leave with Matthew P. During that interaction in the parking lot, Saunders did not tell Massaro she was bringing Matthew P. to the trailer that evening, but Massaro was expecting her to go home at some point that evening based on their coparenting routine.

Massaro went straight home from the parking lot. Because it was cold, he started a fire in the stove, drove his car "to where [he] was sleeping right around the corner," parked the car there, walked back to the trailer (usually a two-minute walk), and started doing laundry by the carport. That is when Matthew P. and Saunders arrived.

Massaro walked out of the carport with his hands up to "show no animosity." He could not tell who the driver was, but he thought it could be Matthew P. so he approached the car to get a better look. He saw a man and asked Saunders if he could talk to him. Matthew P. invited him into the car and the men spoke for a few minutes while Matthew P. had his hands in his pockets. Trash on the floorboard made it uncomfortable because Massaro was wearing big boots. He looked down to clear away some of the trash with his feet. Out of the corner of his eye, he saw "some object coming down . . . so [he] backed up and it got [him] in the leg." Had he not moved he would have been struck on the temple. He wrapped his arm around Matthew P.'s arm and took a hammer out of his hand.

Matthew P. hit Massaro a few times and Massaro hit Matthew P. with the hammer two or three times as they struggled for the hammer inside the car with the overhead light on. Massaro honked the horn and yelled for help. Once the men were outside the car, Matthew P. attacked Massaro again, putting him in "chokes" and using moves Massaro had never seen before. Massaro saw his neighbor and asked her to call for help.

Massaro testified that Ray misunderstood when Massaro offered his truck and chainsaw at the Amador County jail in spring 2021. The offer was in exchange for Ray's help remodeling Massaro's home. During their conversation in jail, Ray did not appear to be "all there." The two did have conversations about Ray testifying at Massaro's trial as a witness, but Ray indicated he would "testify in good faith," and Massaro did not tell him what to say. Regarding the backdated rental agreement, Massaro explained that the date he put on it was the true date of their oral agreement. Ray had stayed in the "front room" of Massaro's trailer beginning in December 2020 and through most of January 2021. Massaro did not draft the agreement or any documents referencing it in exchange for anything.

*Closing Arguments*

During closing arguments, the prosecutor asserted the case would rise and fall on the theory of self-defense. "A lot" depended on "who started this thing with the hammer," the prosecutor continued, because "[s]elf defense doesn't exist if the defendant is the guy that showed up armed and then clocked [Matthew P.] over the head." But even if the jurors believed Matthew P. produced the hammer and used it first, it was unreasonable for Massaro to hit Matthew P. in the head with it multiple times, the prosecutor suggested. "[I]s it self defense? 125-pound [Matthew P.] versus 186-pound Massaro." The prosecutor further argued that Massaro's offer to Ray for favorable testimony was an indication of consciousness of guilt.

Defense counsel argued it was self-defense when Massaro struck Matthew P. with the hammer because Matthew P. was fighting for control of the hammer. "If you hit somebody with a hammer and they're still fighting you . . . for the hammer, it's time to hit them again."

On rebuttal, the prosecutor asserted Massaro was the one "cooking up stories" and "making things up." With the help of a PowerPoint slide, the prosecutor argued: "A lie told once remains a lie, but a lie told a thousand times becomes the truth." Defense

8

counsel objected to this "as an improper reference, comparing the defendant to a Nazi." The trial court overruled the objection, and the prosecutor then told the jury that he was "not by any stretch calling [defense counsel] a Nazi. Let's make that clear." Later, outside the presence of the jury, the trial court noted the PowerPoint slide quoted a Nazi propagandist and in looking at whether the slide was prosecutorial misconduct, it found there was none because the slide cited historical literature and it was defense counsel that used the term Nazi, not the prosecutor.

F. *Jury Instructions, Verdicts, and Sentencing*

The trial court instructed the jury on the two counts charged. Count 1 related to premeditated attempted murder and the lesser included offense of attempted voluntary manslaughter. (Pen. Code, §§ 192, subd. (a), 664.)[3] The trial court explained that attempted murder is reduced to attempted voluntary manslaughter if Massaro attempted to kill someone (a) because of a sudden quarrel or in the heat of passion or (b) because he acted in imperfect self-defense.

For count 2, the trial court instructed the jury on the offense of assault with a deadly weapon other than a firearm. (§ 245, subd. (a)(1).) The trial court explained that self-defense was a complete defense to counts 1 and 2, but Massaro did not act in lawful self-defense if he used more force than was reasonable. The jury found Massaro not guilty of attempted murder, but guilty of attempted voluntary manslaughter. The jury also found Massaro guilty of count 2 and found true several enhancements.

The trial court sentenced Massaro to an aggregate term of eight years six months on count 1 and the associated enhancements. For count 2 and the associated enhancement, the trial court imposed an aggregate term of six years but stayed that sentence pursuant to section 654. Massaro appealed.

---

[3] Undesignated statutory references are to the Penal Code.

9

II

*The Perjury Case*

During their pretrial detention, Massaro offered his pickup truck and chainsaw to Ray in exchange for Ray's testimony that, because the overhead light in the passenger compartment was on, he saw the passenger in Matthew P.'s car get hit over the head with an object. During that conversation, however, Ray told Massaro that he did not witness the entire incident and that when he arrived Massaro and Matthew P. were wrestling on the ground outside of the car. At a pretrial hearing in connection with Massaro's attempted murder trial, Ray testified falsely that he saw the driver hit the passenger with an object while they were both inside the car.

After a jury found Massaro guilty of subornation of perjury (§ 127) and bribing a witness (§ 137, subd. (a)), the trial court sentenced him to one year in state prison for suborning perjury. The trial court also imposed eight months in state prison for bribery but stayed that sentence pursuant to section 654. Massaro appealed. After multiple granted requests for extension of time by both parties, the cases were fully briefed in August 2023, and assigned to this panel shortly thereafter.

DISCUSSION

I

*Evidentiary Rulings in the Attempted Murder Case*

Massaro contends the trial court made multiple erroneous evidentiary rulings whose cumulative impact resulted in prejudice requiring reversal of his attempted voluntary manslaughter conviction. We disagree.

A.     *Additional Background*

In a pretrial proceeding, the trial court explained why some of the evidence involving Ray that Massaro now challenges on appeal was admissible. The trial court observed there were multiple grounds for admissibility, including Massaro's "consciousness of guilt, which is a nonhearsay purpose." In a separate pretrial

10

proceeding, the trial court ruled that Massaro's conduct giving rise to a 2008 misdemeanor conviction for making a false report of a crime to a peace officer was admissible, in part because its probative value was "extremely relevant" in this case where the credibility of those testifying was an important consideration.

B. *Legal Background*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence is relevant if it tends to establish material facts such as identity, intent, or motive. Even if evidence is relevant, Evidence Code section 352 provides that a trial court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will, inter alia, create " 'substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " The phrase "undue prejudice" relates to inflaming the jurors' emotions and motivating them to have a bias against an individual based on evidence that has only slight probative value on the issues. The phrase does not contemplate damage to a party that naturally flows from probative evidence. (*People v. Yang* (2021) 67 Cal.App.5th 1, 32.)

We apply the abuse of discretion standard of review to the trial court's rulings on the admissibility of evidence, including rulings that "turn[ ] on the relevance of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) In conducting that review, we consider " '(1) whether the challenged evidence satisfied the "relevancy" requirement set forth in . . . [Evidence Code] section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under . . . [Evidence Code] section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' " (*People v. Yang*, *supra*, 67 Cal.App.5th at p. 33.)

11

The trial court's reasoning for making the evidentiary ruling is not determinative, because if the ruling was correct on any ground, we must affirm it. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

C.      *Ray's Statements*

Massaro challenges the trial court's rulings allowing the prosecution to introduce (a) Ray's testimony from a pretrial hearing regarding what he saw of the incident, (b) Ray's testimony from a pretrial hearing regarding documents he and Massaro created concerning Ray's residential address, and (c) the spring 2021 recorded jail telephone call between Ray and his girlfriend. We are not persuaded.

1.      *Ray's Pretrial Hearing Testimony Regarding the Incident*

Massaro contends Ray's testimony at the pretrial hearing describing his observations of the incident were irrelevant and therefore inadmissible in the prosecution's case-in-chief. Specifically, Massaro contends Ray's testimony was not relevant to prove any disputed fact of consequence in the attempted murder trial.

We disagree with Massaro and agree with the People that Ray's testimony was a piece of a puzzle that, when complete, tended to show Massaro sought to introduce false evidence because he believed he was guilty. Whether Massaro's "consciousness of guilt of [attempted] murder should be inferred from" that completed puzzle was "a disputed issue the resolution of which would be aided by a thorough examination of the manner in which" Massaro's introduction of false evidence occurred. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007; see *People v. Holloway* (2004) 33 Cal.4th 96, 142 ["The inference of consciousness of guilt from . . . fabrication . . . of evidence is one supported by common sense"]; *People v. Kimble* (1988) 44 Cal.3d 480, 496-498 [" 'fabrications as to the facts of the case are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime' "].) Here, it was not an abuse of discretion for the trial court to admit Ray's

pretrial hearing testimony, because that testimony helped to present the full picture of Massaro's effort to introduce false evidence at his trial for attempted murder.

2. *Ray's Pretrial Hearing Testimony About Documents*

As in the immediately preceding issue, Massaro contends Ray's testimony at the pretrial hearing about the backdated document he and Massaro created in jail (to memorialize their earlier oral rental agreement) was inadmissible because it was irrelevant. To the contrary, this evidence tended to show both Ray's bias as a witness and was another piece of the puzzle reflecting Massaro's scheme to present false evidence at his attempted murder trial. Creation by the two men of the backdated rental agreement document permitted the inference that they embarked on a mutually beneficial scheme to fabricate evidence in their respective criminal matters. (Cf. *People v. Holford* (2012) 203 Cal.App.4th 155, 178 [because evidence " 'has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum,' " " 'the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt' "].) Therefore, the trial court did not abuse its discretion in admitting the evidence.

3. *The Recorded Jail Telephone Call*

Massaro argues the recorded telephone call in which Ray tells his girlfriend that Massaro offered his pickup truck and chainsaw in exchange for Ray's false testimony was inadmissible hearsay. The People contend Ray's statements in the telephone call were admissible under Evidence Code section 1294, which permits introduction of a prior inconsistent statement of a witness under certain circumstances (see *People v. Martinez* (2003) 113 Cal.App.4th 400, 408-410) that were satisfied here, including that Ray made his statements in the telephone call before he testified at the pretrial hearing. In his reply brief, Massaro does not contest the legal underpinnings of the People's Evidence Code section 1294 argument. Rather, he contends the People's argument "hinges on the

13

admissibility of Ray's testimony from the [pretrial] hearing, which, itself, was inadmissible."

But as we explained above, Ray's testimony from the pretrial hearing *was* admissible.  Thus, Massaro does not persuade us the trial court abused its discretion in admitting the recorded jail telephone call.  (See *People v. Foss* (2007) 155 Cal.App.4th 113, 126 [" 'Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error' "].)

### D.     *Massaro's Prior Conviction*

Massaro contends the trial court erred when it permitted the prosecution to impeach him with evidence of his 12-year-old misdemeanor conviction for making a false report to a police officer.  But the trial court did not abuse its discretion, because this evidence tended to show Massaro's willingness to lie, a consideration whose probative value was significant in this case where Massaro and Matthew P. gave conflicting versions of the beginning of the incident.  (See *People v. Rivera* (2003) 107 Cal.App.4th 1374, 1380 [even though nonfelonious misconduct involving moral turpitude may be a less forceful indicator of dishonesty, it still may suggest a willingness to lie].)

### E.     *No Error to Accumulate*

Because we find no error, we reject Massaro's argument regarding any cumulative effect of erroneous evidentiary rulings.

### II

### *The "Nazi Propaganda" Reference in Closing Argument*

Massaro contends the prosecutor committed prejudicial misconduct in closing argument by characterizing the defense as "Nazi Propaganda."  The People contend the argument is forfeited on appeal because, though Massaro objected, "it is not necessarily clear that defense counsel was claiming prosecutorial misconduct on the grounds of disparaging [defense] counsel."  On the merits, the People argue there was no

14

misconduct. We conclude this claim is forfeited because Massaro did not present adequate argument on it in his appellate briefing.

A.    *Additional Background*

After the jury began deliberating, the parties and the trial court discussed the prosecutor's quote of and reference to a "Nazi propagandist" in rebuttal argument. Defense counsel asked the court to "find a mistrial or give a curative instruction." "I'm not assigning misconduct," defense counsel said, "although it's close on the disparaging of counsel . . . . I don't like to be compared to a Nazi or have the jury told . . . that I'm repeating a lie." The trial court observed that the "quote was used when [the prosecutor] [was] arguing that the defendant is, in essence, making things up . . . , not" defense counsel.

B.    *Forfeiture*

"As a court of review, our role is to evaluate the arguments the parties have presented, not 'construct [alternative] theor[ies that might be] supportive' of their claims. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)" (*Coast Community College Dist. v. Commission on State Mandates* (2022) 13 Cal.5th 800, 823, fn. 10; see *In re Harris* (2021) 71 Cal.App.5th 1085, 1100 ["it is not our role to make arguments for petitioner" in a habeas corpus matter], review granted Mar. 9, 2022, S272632.) "One cannot simply say the court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.) An appellant bears the burden to support any claim of error with reasoned argument, analysis, and citation to pertinent legal authorities, and the failure to do so forfeits the issue on appeal. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 603.)

Here, Massaro references *People v. Hill* (1998) 17 Cal.4th 800, 844, wherein our Supreme Court quoted an opinion of the United States Supreme Court for the proposition that " '[c]atch words and labels . . . are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard.' "

15

Massaro follows that cite to *Hill* with authority for the propositions that it is improper for a prosecutor to (a) imply that defense counsel has fabricated evidence or (b) denigrate defense counsel in closing argument. Massaro argues: "It cannot be definitively said whether the prosecutor's comparison" to a Nazi propagandist "was perceived by the jury as being directed at appellant's trial counsel, or at appellant, himself. In either case, it was improper . . . and . . . prejudicial."

Massaro "leave[s] it up to [us] to figure out" (*Niko v. Foreman*, *supra*, 144 Cal.App.4th at p. 368) if the prosecutor's comments amounted to prosecutorial misconduct either because the prosecutor's comments were directed at *Massaro* or because they were directed at *defense counsel*. Those are different questions with distinct relevant authorities.[4] Thus, the argument is inadequate, and the claim is forfeited on appeal. (See *People v. Bonin* (1989) 47 Cal.3d 808, 857, fn. 6 ["since [the defendant] does not present adequate argument on the point, we reject the claim as not properly raised"].)

### III

*Sufficiency of the Evidence for Convictions in the Perjury Case*

Massaro contends the prosecution failed to present any evidence tending to prove he knew that Ray had not seen the beginning of the incident and intended to testify falsely. It is not a crime, Massaro contends, to "induc[e] someone to testify as to what

---

[4] See *People v. Maury* (2003) 30 Cal.4th 342, 420 [rejecting a claim of prosecutorial misconduct and explaining that defense counsel was not at fault for "failing to object to the prosecutor's comparison of defendant to Nazi leaders" in closing argument]; *People v. Bemore* (2000) 22 Cal.4th 809, 846-847 ["the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"; "by referring to counsel in the first person . . . the prosecutor simply employed a rhetorical device calculated to focus the jury's attention on strong circumstantial evidence of guilt and on any corresponding weaknesses in the defense case" and "[n]o improper attack on counsel's personal integrity or professional tactics could reasonably be gleaned from such remarks"].

16

one knows to be true."  Assuming for the sake of argument that Massaro's premise is correct (but cf. *People v. Terry* (1955) 44 Cal.2d 371, 377 [affirming a conviction under § 137 for bribing a witness, and holding the relevant question is whether "the parties understand that the testimony will be *influenced in some manner* by the giving of the bribe" (italics added)]), he is wrong on its application here.

Ray testified in the perjury case that during the jail conversation in which Massaro offered his truck and chainsaw for testimony (that Ray saw the driver of the car hit the passenger over the head with an object), Ray told Massaro what he saw and what he did *not* see regarding the incident.  Ray further testified in the perjury case that he saw Massaro and Matthew P. wrestling on the ground during the incident, but nothing that happened inside Matthew P.'s car before that.  This is evidence tending to prove Massaro knew Ray had not seen the beginning of the incident inside Matthew P.'s car but would testify falsely that he had seen it.

That *other* testimony by Ray may have been inconsistent does not justify reversal of Massaro's convictions on appeal, because it was the jury's role to resolve any such inconsistencies and to make credibility findings.  (See *People v. Jones* (1984) 155 Cal.App.3d 153, 167 [" ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends" ' "]; *id.* at p. 168 ["The jury, who personally observed the witness under the very circumstances of direct and cross-examination, believed her testimony on direct examination and rejected any inconsistencies that surfaced on cross-examination"]; *People v. Marsden* (1965) 234 Cal.App.2d 796, 797-798 [rejecting a contention of insufficient evidence to support a conviction, because inconsistencies in the witness's testimony on direct and on cross-examination "at the most, went only to the weight of his testimony — a matter on which the jury's determination is conclusive"].)  Thus, Massaro's claim is not persuasive.

## IV

### *Abstract of Judgment*

The abstract of judgment for Massaro's attempted voluntary manslaughter conviction (case No. 21-CR-30381) reflects a conviction for voluntary manslaughter, not *attempted* voluntary manslaughter. It also incorrectly references section 243 rather than section 245 for Massaro's conviction for assault with a deadly weapon. We shall order the abstract of judgment corrected accordingly.

### DISPOSITION

The judgments are affirmed. The clerk of the trial court is directed to correct the abstract of judgment in case No. 21-CR-30381 to show that Massaro was convicted of attempted voluntary manslaughter and that his conviction for assault with a deadly weapon was in violation of section 245, subdivision (a)(1). The clerk shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


/s/
BOULWARE EURIE, J.

We concur:


/s/
HULL, Acting P. J.


/s/
MESIWALA, J.


18